**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | | |
|---|---|---|
| THE FAMILY PLANNING ASSOCIATION OF MAINE D/B/A MAINE FAMILY PLANNING, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. _____ |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; | ) ) ) | |
| ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services; | ) ) ) | **REQUEST FOR** **IMMEDIATE RELIEF** |
| CENTERS FOR MEDICARE & MEDICAID SERVICES; | ) ) ) | |
| and | ) ) | |
| MEHMET OZ, in his official capacity as the Administrator of the Centers for Medicare & Medicaid Services, | ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFF MAINE FAMILY PLANNING'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ................................................................. **1**

**FACTUAL BACKGROUND** ..................................................................... **2**

    I.    MFP Provides Essential Health Care. ............................................. 2

    II.   MFP and Its Patients Rely on Medicaid and Its Federal Reimbursements. ........................ 3

    III.   MFP Was Illegally Ensnared as a Byproduct of the Defunding Provision's Intent to Target Planned Parenthood. ........................................................... 4

    IV.  The Defunding Provision Has Had—and Will Continue to Have—a Devastating Impact on MFP's Ability to Provide Care. ...................................................... 6

**LEGAL STANDARD** ............................................................................. **8**

**ARGUMENT** ......................................................................................... **9**

    I.    MFP Is Likely to Succeed on Its Equal Protection Claim. ....................... 9

    II.   MFP and Its Patients Are Suffering—and Will Continue to Suffer—Irreparable Injury Without Relief. ............................................................................... 16

    III.  The Balance of Equities and Public Interest Weigh in Favor of Granting Relief. ............ 18

    IV.  The Court Should Require No Bond or a Nominal Bond. ........................... 20

**CONCLUSION** .................................................................................... **20**

# TABLE OF AUTHORITIES

**Cases**

*Beverly Enters. v. Mathews*, 432 F. Supp. 1073 (D.D.C. 1976)....................................................19

*Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8 (1st Cir. 2004)..........................................9

*Bolling v. Sharpe*, 347 U.S. 497 (1954) ...............................................................................9

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)...........................................9, 11

*Coastal Cntys. Workforce, Inc. v. LePage*, 284 F. Supp. 3d 32 (D. Me. 2018)...........................17

*Corp. Techs., Inc. v. Harnett*, 731 F.3d 6 (1st Cir. 2013) ...............................................9

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022)..........................................12

*Does 1-6 v. Mills*, 16 F.4th 20 (1st Cir. 2021) ................................................................18

*Dr. José S. Belaval, Inc. v. Peréz-Perdomo*, 465 F.3d 33 (1st Cir. 2006) ...................................18

*Ex parte Young*, 209 U.S. 123 (1908) .................................................................................18

*Francisco Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1 (1st Cir. 2009)....................................18

*Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*, 925 F.2d 6 (1st Cir. 1991) .. 20

*K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907 (1st Cir. 1989)...........................................17

*Lawrence v. Texas*, 539 U.S. 55 (2003)..............................................................................11

*Lemon v. Kurtzman*, 411 U.S. 192 (1973)............................................................................19

*Maine v. U.S. Dep't of Agric.*, No. 25-cv-00131, 2025 WL 1088946 (D. Me. Apr. 11, 2025)......20

*Marlo M. ex rel. Parris v. Cansler*, 679 F. Supp. 2d 635 (E.D.N.C. 2010) ................................19

*Mass. Ass'n of Older Ams. v. Sharp*, 700 F.2d 749 (1st Cir. 1983)............................................17

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d 1 (1st Cir. 2012) ....................15

*Mediplex of Mass., Inc. v. Shalala*, 39 F. Supp. 2d 88 (D. Mass. 1999) ...................................17

*Minnesota v. Planned Parenthood of Minn.*, 448 U.S. 901 (1980)............................................12

*Monga v. Nat'l Endowment for Arts*, 323 F. Supp. 3d 75 (D. Me. 2018). .................................9

*Nat'l Council of Nonprofits v. Off. of Mgmt.*, No. CV 25-239 (LLA), 2025 WL 597959 (D.D.C. Feb. 25, 2025) ....................................................................................................................20

*Neighborhood Ass'n of The Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323 (D. Mass. 2005). ...............................................................................................................................20

*Ohio v. Becerra*, 87 F.4th 759 (6th Cir. 2023) ...................................................................14

*Planned Parenthood Fed'n of Am. v. Kennedy*, No. 1:25-cv-11913 (D. Mass. filed July 7, 2025)6, 13, 19, 20

*Planned Parenthood of Cent. & N. Ariz. v. Arizona*, 718 F.2d 938 (9th Cir. 1983)....................14

*Planned Parenthood of Cent. N.C. v. Cansler*, 804 F. Supp. 2d 482 (M.D.N.C. 2011)..........14, 15

*Planned Parenthood of Greater Ohio v. Hodges*, 188 F. Supp. 3d 684 (S.D. Ohio 2016) ..........14

*Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205 (10th Cir. 2018)................................16

*Planned Parenthood of Minn. v. Minnesota*, 612 F.2d 359 (8th Cir. 1980)..........................12, 14

*Plyler v. Doe*, 457 U.S. 202 (1982)....................................................................................15

*R.I. Hous. & Mortg. Fin. Corp.*, 246 F.3d 1 (1st Cir. 2001) ...................................................9

*Ranschburg v. Toan*, 709 F.2d 1207 (8th Cir. 1983) ...........................................................16

*Rio Grande Cmty. Health Ctr. Inc. v. Rullan*, 397 F.3d 56 (1st Cir. 2005) ............................ 16, 19

*Romer v. Evans*, 517 U.S. 620 (1996) ....................................................................................... 9, 11

*U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973). ...................................................... 11, 13, 15

*United States v. Windsor*, 570 U.S. 744 (2013) ...................................................................... 12, 13

## Statutes

2024 Me. Laws ch. 648 (L.D. 227) ............................................................................................ 13

Departments of Labor and Health, Education, and Welfare Appropriation Act of 1977, Pub. L. No. 94-439, 90 Stat. 1418 (1976) ................................................................................... 13

Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460 (2024) .... 13

Me. Rev. Stat. Ann. tit. 22 § 1598 ............................................................................................. 12

Me. Rev. Stat. Ann. tit. 22 § 3196 ............................................................................................. 12

Me. Rev. Stat. Ann. tit. 24-A § 4320-M .................................................................................... 12

## Other Authorities

American Health Care Act of 2017, H.R. 1628, 115th Cong. (2017). .......................................... 5

Better Care Reconciliation Act of 2017, H.R. 1628, 115th Cong. (2017) (July 20, 2017 discussion draft), https://www.budget.senate.gov/imo/media/ doc/ERN17500.pdf ................... 5

Bill Heniff Jr., Cong. Rsch. Serv., RL30862, *The Budget Reconciliation Process: The Senate's "Byrd Rule"* (2022), https://www.congress.gov/crs-product/RL30862 .................................... 5

Comm. on the Budget, 115th Cong., *Background on the Byrd Rule Decisions from the Senate Budget Committee Minority Staff* (2017), https://www.budget.senate.gov/imo/media/doc/Background%20on%20Byrd%20Rule%20decisions_7.21%5B1%5D.pdf ......................................................................................... 5

Cong. Budget Off., *Estimated Budgetary Effects of an Amendment in the Nature of a Substitute to H.R. 1, the One Big Beautiful Bill Act* (2025), https://shorturl.at/0Qp6c ............................. 6

Michael T. Morley, *Erroneous Injunctions*, 71 Emory L.J. 1137 (2022) ................................... 18

One Big Beautiful Bill Act, H.R. 1, 119th Cong. (2025) (as enrolled). ............................... 1, 5, 6

S. Amend. 267 to H.R. 1628, 115th Cong. (2017) ....................................................................... 5

## Rules

Fed. R. Civ. P. 65 ....................................................................................................................... 20

## Regulations

10-144 Me. Code R. ch. 101 ....................................................................................................... 14

42 C.F.R. pt. 1001 ...................................................................................................................... 14

42 C.F.R. pt. 1003 ...................................................................................................................... 14

45 C.F.R. § 156.235 ................................................................................................................ 3, 15

## PRELIMINARY STATEMENT

Plaintiff Maine Family Planning ("MFP") offers critical health care services—including birth control, cancer screenings, routine check-ups, and other primary care—to thousands of Mainers each year. With eighteen clinics located across the state, and a mobile health care facility, MFP is devoted to ensuring that patients from the most underserved areas and populations can access health services. But Section 71113 of the so-called One Big Beautiful Bill Act, H.R. 1, 119th Cong. (2025) (as enrolled) (the "Defunding Provision")—which deprives MFP of federal Medicaid reimbursement for *all* its non-abortion health care services—threatens MFP's ability to continue caring for patients who receive care other than abortion, nearly half of whom are on Medicaid.

The Defunding Provision is the latest backdoor attempt to defund Planned Parenthood and decrease abortion care nationwide—this time, by using MFP as a smokescreen to do so. Such irrational discrimination violates the Fifth Amendment's guarantee of equal protection and threatens irreparable and devastating harm to MFP and the thousands of patients who receive critical family planning, reproductive health, and primary care services at MFP each year. Due to the Defunding Provision, MFP has already been forced to turn away new primary care patients on Medicaid and will be forced to continue doing so absent immediate relief. Approximately four Medicaid patients reach out to MFP every week seeking primary care; now that MFP cannot accept these patients, they may not be able to receive preventative care and treatment for chronic conditions like diabetes and asthma in a timely manner, which will have devastating consequences to their health.

Absent preliminary relief, MFP will also have to begin the process of discharging existing family planning and primary care Medicaid patients no later than September 30, 2025 and will not be able to see these patients after October 31, 2025. Many of these patients do not see any health

care provider besides MFP in a given year, and face geographic and economic challenges in identifying and accessing alternative providers. As a result, thousands of patients will be left without access to time-sensitive, life-saving health care. For these reasons, a temporary restraining order and/or preliminary injunction is warranted.

## FACTUAL BACKGROUND

### I.    MFP Provides Essential Health Care.

MFP is a 501(c)(3) nonprofit organization whose mission is "to ensure that all people have access to high-quality, culturally relevant and affordable sexual and reproductive health care services . . . ." Decl. of Evelyn Kieltyka in Supp. Pl.'s Mot. for a TRO and/or Prelim. Inj. ¶ 6 ("Kieltyka Decl."). MFP operates eighteen clinics spanning twelve counties, including rural Aroostook and Washington Counties. *Id.* ¶¶ 8, 10. At its clinics, MFP offers comprehensive family planning and reproductive health care, including annual gynecological exams; screening for cervical and breast cancer; family planning counseling; contraceptive services; preconception consultation; screening, diagnosis and treatment of urinary tract, vaginal, and sexually transmitted infections ("STIs"); endometrial and vulvar biopsy; hormone therapy—and abortion care. *Id.* ¶ 7.

MFP also provides primary care at its Ellsworth, Houlton, and Presque Isle clinics, including wellness and preventive care; diagnosis and treatment of common acute and chronic conditions like strep throat, asthma, or diabetes; and geriatric health services. *Id.* ¶ 18. MFP launched a mobile health care facility in 2024 to provide urgent primary care, wound care, and sexual and reproductive health services to underserved populations like unhoused people, people with substance use issues, and migrant farm workers. *Id.* ¶ 20.

MFP provides essential health care to thousands of Mainers. In calendar year 2024, MFP served 8,735 patients, including 633 primary care patients and 7,215 family planning patients. *Id.*

¶ 11. Two MFP clinics are listed as essential community providers ("ECPs") in the family planning category on the HHS Rolling Draft ECP List for the Federally-facilitated Marketplace ("ECP List"). *Id.* ¶ 10. By definition, ECPs serve "predominantly low-income, medically underserved individuals." 45 C.F.R. § 156.235(c).

For thousands of Mainers, MFP is the only comprehensive family planning and reproductive health care provider accessible to them. *See* Kieltyka Decl. ¶¶ 10–13, 19, 20, 32, 34. Outside of MFP and its subgrantees, family planning services in Maine are generally only available through private gynecologists, non-specialists, Federally Qualified Health Centers ("FQHCs"), MaineHealth Maine Medical Center ("MMC"), and an independent health center, Mabel Wadsworth Center ("Mabel's"). *Id.* ¶ 12. Recent closures of hospital labor and delivery units and the accompanying loss of providers have exacerbated this existing provider shortage. *Id.* ¶ 17. As to abortion care specifically, aside from MFP's clinics, the only other publicly accessible health centers that provide abortions in Maine are Planned Parenthood of Northern New England ("PPNNE") clinics and Mabel's. *Id.* ¶ 13. PPNNE is also impacted by the Defunding Provision. *Id.*

## II.    MFP and Its Patients Rely on Medicaid and Its Federal Reimbursements.

To ensure health care is accessible to all patients regardless of income, MFP has accepted Medicaid since 1998. *Id.* ¶ 23. MFP clinics serve Maine counties with some of the highest rates of Medicaid enrollment, including Aroostook, Washington, and Somerset Counties, where approximately 40 percent of the population relies on Medicaid. *Id.* ¶ 30. Between July 1, 2022 and June 30, 2023, 41 percent of MFP's family planning network's patients had public insurance, 12 percent were uninsured, and 82 percent fell at or below 250 percent of the federal poverty level and qualified for free or reduced services. *Id.* In calendar year 2024, 49.8 percent of MFP's patients

3

who received care other than abortion were on Medicaid. *Id.*

Under Medicaid, MFP provides primary care, annual wellness exams, routine gynecologic exams, screenings for cervical and breast cancer, STI testing, and contraceptive care. *Id.* ¶¶ 7, 18, 22, 31. For many patients on Medicaid, MFP is the only provider where they can practically obtain care because they live in rural, underserved areas; have challenges identifying another provider who will accept Medicaid; or have difficulty traveling to brick and mortar clinics. *Id.* ¶¶ 20, 27, 34. Moreover, many patients prefer to be seen at MFP because MFP specializes in family planning and reproductive health care, and patients trust MFP to provide sensitive care in a nonjudgmental and confidential manner. *Id.* ¶ 33; Decl. of Cassidy Jarvis in Supp Pl.'s Mot. for a TRO and/or Prelim. Inj. ¶ 3 ("Jarvis Decl."). Without Medicaid, these patients would not be able to afford care. Kieltyka Decl. ¶¶ 27, 30; Jarvis Decl. ¶¶ 5–6.

Medicaid is essential to MFP. Approximately 20 to 25 percent of MFP's annual budget— roughly $1.9 million dollars—comes from Medicaid funding. Kieltyka Decl. ¶ 24. Specifically, between July 1, 2022 and June 30, 2023, 22.7 percent of MFP's budget came from Medicaid. *Id.* In federal fiscal year 2023, MFP received more than $800,000 from Medicaid reimbursements. *Id.* MFP does not use or receive any federal funds, whether from Medicaid or Title X, to pay for abortion care outside of the limited exceptions permitted under the Hyde Amendment. *Id.* ¶ 25.

## III.   MFP Was Illegally Ensnared as a Byproduct of the Defunding Provision's Intent to Target Planned Parenthood.

The Defunding Provision is the culmination of a years-long attempt to exclude Planned Parenthood from receiving federal Medicaid funding for any health care services. During a previous attempt to defund Planned Parenthood using the budget reconciliation process, Congress passed a provision to prohibit Medicaid funding for "prohibited entit[ies]" that met criteria substantively identical to the Defunding Provision, but with a threshold of $350,000,000 in

Medicaid payments.[1] This attempt failed when the Senate Parliamentarian determined that "prohibit[ing] only Planned Parenthood from receiving Medicaid funds for one year" violates the Byrd Rule, a procedural rule that prevents inclusion of "extraneous" non-budgetary provisions in budget reconciliation legislation and therefore requires 60 votes to pass (rather than the ordinary 51 votes for budget reconciliation legislation).[2]

As enacted on July 4, 2025, the Defunding Provision provides that "[n]o federal funds that are considered direct spending and provided to carry out a State plan under [Medicaid] or a waiver of such a plan shall be used to make payments to a prohibited entity for items and services furnished during the 1-year period beginning on the date of the enactment of this Act . . . ." H.R. 1, § 71113. A "prohibited entity" is defined as any entity that that meets the following criteria as of "the first day of the first quarter beginning after the date of enactment":[3]

(1) is organized as a 501(c)(3) and exempt from tax under 501(a) of the Internal Revenue Code of 1986;
(2) is an essential community provider under 45 C.F.R. § 156.235 and "primarily engaged in family planning services, reproductive health, and related medical care";
(3) provides abortions for reasons other than to terminate pregnancies caused by rape or incest or where the patient is at risk of death without an abortion; and
(4) received more than $800,000 in federal and state expenditures under Medicaid in fiscal year 2023. *Id.*

---

[1] American Health Care Act of 2017, H.R. 1628, 115th Cong. § 103 (2017).

[2] Comm. on the Budget, 115th Cong., *Background on the Byrd Rule Decisions from the Senate Budget Committee Minority Staff* (2017), https://www.budget.senate.gov/imo/media/doc/Background%20on%20Byrd%20Rule%20decisions_7.21%5B1%5D.pdf; Better Care Reconciliation Act of 2017, H.R. 1628, 115th Cong., § 123 (2017) (July 20, 2017 discussion draft), https://www.budget.senate.gov/imo/media/ doc/ERN17500.pdf; Bill Heniff Jr., Cong. Rsch. Serv., RL30862, *The Budget Reconciliation Process: The Senate's "Byrd Rule"* 3–5 (2022), https://www.congress.gov/crs-product/RL30862. Anti-abortion senators responded by reducing the threshold for "prohibited entities" from $350 million to $1 million. S. Amend. 267 to H.R. 1628, 115th Cong. § 106 (2017). The Parliamentarian allowed the bill to proceed with the $1 million threshold, though the bill ultimately failed to pass. *Id.*

[3] Though the Defunding Provision defines "prohibited entity" based on the entity's activities as of the first day of the next quarter following enactment, or October 1, 2025, the Provision states that it takes effect immediately, prior to the determination of whether an organization qualifies. Thus, though an entity may not know for certain whether it would be a "prohibited entity" until October 1, it would nonetheless be prohibited from receiving federal Medicaid funding for all of its services as of July 4.

Along with Planned Parenthood, MFP falls within the Defunding Provision's criteria for prohibited entities.[4] Kieltyka Decl. ¶¶ 13, 36. The Defunding Provision does not prohibit family planning providers that are similarly situated to MFP from receiving federal Medicaid money. For example, at least three other providers in Maine are not impacted, even though they provide similar family planning and primary care services and serve similar patient populations as MFP. *Id.* ¶¶ 14–16. The Defunding Provision will also not save taxpayers any money. The CBO estimates that it will cost taxpayers $52 million over the next 10 years, and an additional $1 million was appropriated for implementation costs in fiscal year 2026 alone.[5]

## IV. The Defunding Provision Has Had—and Will Continue to Have—a Devastating Impact on MFP's Ability to Provide Care.

Consistent with the law, MFP has stopped billing Medicaid for reimbursements for covered patient care immediately. Kieltyka Decl. ¶ 24; Jarvis Decl. ¶ 5. MFP has stopped accepting new Medicaid patients seeking primary care and is turning these patients away, even though approximately four patients with Medicaid as their primary or secondary insurance contact MFP every week seeking primary care. Kieltyka Decl. ¶ 22; Jarvis Decl. ¶ 4. MFP has decided to continue seeing existing Medicaid patients; otherwise, overnight, patients would lose access to essential and time-sensitive health care like cancer screenings, birth control, and treatment for complex, chronic medical conditions. Jarvis Decl. ¶¶ 5–6; Kieltyka Decl. ¶¶ 22, 27–28. MFP has

---

[4] Planned Parenthood filed suit on July 7, 2025. *Planned Parenthood Fed'n of Am. v. Kennedy*, No. 1:25-cv-11913 (D. Mass. filed July 7, 2025), ECF No. 1. The court issued a temporary restraining order the same day, enjoining defendants from "enforcing, retroactively enforcing, or otherwise applying the provisions of Section 71113 of 'An Act to provide for reconciliation pursuant to title II of H. Con. Res. 14,'" against Planned Parenthood and requiring defendants to "take all steps necessary to ensure that Medicaid funding continues to be disbursed in the customary manner and timeframes" to Planned  Parenthood. TRO, *Planned Parenthood Fed'n of Am. v. Kennedy*, No. 1:25-cv-11913 (D. Mass. July 7, 2025), ECF No. 18; Am. TRO, *Planned Parenthood Fed'n of Am. v. Kennedy*, No. 1:25-cv-11913 (D. Mass. July 11, 2025), ECF No. 46.

[5] Cong. Budget Off., *Estimated Budgetary Effects of an Amendment in the Nature of a Substitute to H.R. 1, the One Big Beautiful Bill Act* (2025), https://shorturl.at/0Qp6c ("Title VII" tab, Section 71115 "Federal Payments to Prohibited Entities"); H.R.1, 119th Cong. § 71113(c).

been forced to use its own limited reserve funds to cover the cost of the patients' visits and contraceptive devices. Kieltyka Decl. ¶¶ 26, 32. But MFP can only continue to cover its Medicaid patients' treatment until October 31, 2025, at the very latest. *Id.* ¶ 26. After this point, MFP will be forced to discharge its family planning and primary care Medicaid patients. *Id.* ¶¶ 22, 26, 29. Consistent with MFP's practice of providing patients with notice of discharge at least 30 days before it becomes effective (including an explanation for the discharge and resources for alternative sources of care), MFP will be forced to notify patients of their discharge from the practice by no later than September 30. *Id.* ¶¶ 22, 29.

Many of MFP's Medicaid patients, and the new Medicaid patients that MFP has had to turn away, will be unable to find a new provider due to far distances, high costs, and Maine's existing shortage of providers—particularly providers who are willing to accept additional Medicaid patients into their practice. *Id.* ¶¶ 27, 34–35; Jarvis Decl. ¶¶ 4–5. As many as 70 percent of MFP's patients do not see any health care provider besides MFP in a given year. Kieltyka Decl. ¶ 19. In many of the rural locations where MFP has clinics, there are limited alternative health care providers, and none that specialize in family planning care. *Id.* ¶ 34. The most medically underserved areas are also the areas where the most patients are on Medicaid. *Id.* ¶¶ 9–10, 30. Similarly, most of the patients seen by MFP's mobile health care facility are Medicaid-enrolled and would not be able to access care without the mobile clinic. *Id.* ¶ 34. Even patients who may be able to access care elsewhere may be forced to travel long distances and face months-long wait times due to the already overstretched health care system in Maine, which may lead some to forgo care entirely. *Id.* ¶ 35. These additional hardships will fall on patients who, by definition, already face significant hurdles in accessing care based on their demographics. *Id.* ¶ 34.

For some patients, the discharge will disrupt a course of treatment, meaning their follow-

up appointments and previously scheduled treatments will be abruptly canceled. *Id.* ¶ 28; Jarvis Decl. ¶ 6. For example, when patients test positive for chlamydia, MFP's protocol is to follow up in 12 weeks to ensure they are no longer infected, or when patients have abnormal cervical cancer screenings, MFP's protocol is to follow up with them in three to six months. Kieltyka Decl. ¶ 28; Jarvis Decl. ¶ 6. Disruption of a course of treatment can be dangerous, and patients may struggle to find a replacement provider in time given the shortage of providers (if they can find a provider at all), particularly a provider who accepts Medicaid. Kieltyka Decl. ¶ 28; Jarvis Decl. ¶ 6.

Without court intervention, several MFP clinics may be forced to restrict or end their services. Kieltyka Decl. ¶ 22. Knowing that clinics may close is already causing fear and uncertainty for MFP staff, who do not know whether they will still have jobs. Jarvis Decl. ¶ 7. Medicaid patients who rely on MFP for reproductive health care, such as birth control, are scared and confused too about what the Defunding Provision means for their care, including patients who already travel significant distances to receive care at MFP's Aroostook County clinics. Jarvis Decl. ¶ 5. Without Medicaid, these patients will be forced to make potentially life-changing decisions about, for example, whether they can afford to pay $25 per month out of pocket for birth control and still pay for other necessities like heating or electricity, or risk experiencing an unplanned pregnancy. *Id.*

## LEGAL STANDARD

To determine whether to issue a temporary restraining order or preliminary injunction, the court applies a four-factor test: "(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." *Bl(a)ck*

*Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004) (citation omitted); *Monga v. Nat'l Endowment for Arts*, 323 F. Supp. 3d 75, 82 (D. Me. 2018). With respect to the first element, "the district court is required only to make an estimation of likelihood of success and need not predict the eventual outcome on the merits with absolute assurance." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (internal quotation marks and citation omitted).

## ARGUMENT

All four factors in the preliminary relief analysis favor the entry of a temporary restraining order and/or preliminary injunction. Without immediate relief from this Court, MFP and its patients will not be able to continue to provide and access essential and potentially life-saving medical care.

### I.    MFP Is Likely to Succeed on Its Equal Protection Claim.

The Fifth Amendment requires that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). When the government treats similarly situated entities differently, the legislative classification must "bear[] a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996). The Defunding Provision violates equal protection by arbitrarily and irrationally treating MFP differently than similarly situated Medicaid providers.

Individuals and incidents are similarly situated where a "prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated . . . . Exact correlation is neither likely nor necessary . . . ." *Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp.*, 246 F.3d 1, 8 (1st Cir. 2001) (internal quotation marks and citations omitted). Here, MFP is similarly situated to Medicaid providers that are (1) non-profits that primarily provide family planning and reproductive health services, but are not on the ECP List;

(2) non-profits listed as family planning providers on the ECP List, but who do not provide abortion care; (3) non-profits that provide family planning and reproductive health services, including abortion, but "primarily" provide other health care services; (4) non-501(c)(3) entities, such as for-profit hospitals and health maintenance organizations ("HMOs"), that are ECPs and provide family planning and abortion services; and (5) entities that otherwise meet the definition but serve fewer Medicaid patients, such that they received less than $800,000 in Medicaid funds in fiscal year 2023. For example:

*Mabel's.* Like MFP, Mabel's is a 501(c)(3) with a clinic in Bangor. Kieltyka Decl. ¶ 14. Mabel's provides the same types of family planning and reproductive health services as MFP (including birth control, cancer screenings, testing and treatment for STIs and vaginal infections, infertility consultation, pregnancy testing and options counseling, prenatal care), some primary care—and abortion. *Id.* Almost half of Mabel's patients rely on Medicaid. *Id.* The sole difference between MFP and Mabel's is that, upon information and belief, Mabel's bills for fewer Medicaid-covered services than MFP, and it does not appear on the ECP List.

*Greater Portland Health ("GPH").* GPH is a 501(c)(3) FQHC that provides the same types of family planning and reproductive health services as MFP (including contraception management and management of HIV/AIDS, Hepatitis C, and other infectious diseases). Kieltyka Decl. ¶ 15. GPH also provides primary care, including wellness exams, sick visits, and management of chronic conditions; behavioral health care, including substance use disorder services; and dental care. *Id.* Like MFP, GPH has clinics within the Greater Portland metropolitan area, and GPH appears on the ECP List as a family planning provider. *Id.* GPH accepts Medicaid, and in 2023 and 2024, approximately half of GPH's patients were on Medicaid. *Id.* The sole difference between MFP and GPH is that, upon information and belief, GPH bills for fewer Medicaid-covered services and does

not provide abortion care.

***MMC.*** MMC is part of MaineHealth, a 501(c)(3) integrated health care system that provides family planning and reproductive health care at some locations, including in Portland. Kieltyka Decl. ¶ 16. MMC provides the same types of family planning and reproductive health care as MFP, including routine gynecological exams; preventive screenings; infertility and family planning counseling; birth control services; pregnancy screening; diagnosis and treatment of STIs and urinary tract and vaginal infections; biopsies for gynecological issues; and miscarriage care. *Id.* Like MFP, MMC provides abortions. *Id.* MMC also provides a range of other medical and behavioral health services, like primary care, urgent and inpatient care, and other specialized care. *Id.* MMC appears on the ECP List and accepts Medicaid. *Id.* The sole difference between MFP and MMC is that, upon information and belief, MMC is not "primarily engaged in family planning services, reproductive health, and related medical care."

These entities provide essentially the same care, to the same population, with the same corporate structure, and same reliance on Medicaid. Yet while these—and myriad providers across the country—may continue to rely on federal Medicaid funding, MFP is prohibited from doing so.

There is no explanation for treating MFP differently from these entities—other than that the legislation was drafted with the goal of ensnaring MFP (but not other similar entities) to avoid the Byrd Rule and thus allow Congress to "defund" Planned Parenthood. *See supra* pp. 4–6. But a "bare congressional desire to harm a politically unpopular group [like Planned Parenthood] cannot constitute a legitimate governmental interest." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).[6] For this exact reason, the Eighth Circuit struck down an analogous law allocating funding

---

[6] *See also Cleburne*, 473 U.S. at 450  ("irrational prejudice" against people with intellectual disabilities could not justify differential treatment); *Romer*, 517 U.S. at 634-35  ("animosity toward" gays and lesbians could not justify differential treatment); *Lawrence v. Texas*, 539 U.S. 558, 582 (2003) (O'Connor, J., concurring) ("Moral disapproval

for family planning services but prohibiting grants to "any nonprofit corporation which perform[ed] abortions" while allowing grants to hospitals and HMOs who performed abortions. *Planned Parenthood of Minn. v. Minnesota*, 612 F.2d 359, 360 (8th Cir. 1980). Applying rational basis, the Court held that Planned Parenthood's "abortion stance has made itself unpopular among some segments of the population," and this "unpopularity in and of itself and without reference to some independent considerations in the public interest cannot justify" the prohibition. *Id.* at 361. The Supreme Court summarily affirmed. *Minnesota v. Planned Parenthood of Minn.*, 448 U.S. 901 (1980).

Moreover, when—as here—federal law "interfere[s] with state sovereign choices" about a matter that is traditionally within state control, "[t]his is strong evidence of a law having the purpose and effect of disapproval of [the targeted] class." *United States v. Windsor*, 570 U.S. 744, 770–71 (2013). As the Supreme Court in *Dobbs v. Jackson Women's Health Organization* emphasized, states are free to regulate or prohibit abortion and "may believe that the abortion right should be even more extensive than the right that *Roe* and *Casey* recognized." 597 U.S. 215, 256, 302 (2022). Maine emphatically does, as Maine "intends to occupy and preempt the entire field of legislation concerning the regulation of a person's decision to terminate a pregnancy and legislation concerning the provision of abortion." Me. Rev. Stat. Ann. tit. 22 § 1598(1-A). Moreover, Maine prohibits treating abortion care differently than other types of reproductive health care. *See* Me. Rev. Stat. Ann. tit. 22 § 3196(1) ("The department shall provide coverage for abortion services to a MaineCare [Maine Medicaid] member."); Me. Rev. Stat. Ann. tit. 24-A § 4320-M(1) (requiring private insurers that cover maternity services to cover abortion services); 2024 Me. Laws ch. 648 (L.D. 227) (finding that "[a]ccess to . . . reproductive health care services

---

of this group, like a bare desire to harm the group, is an interest that is insufficient to satisfy rational basis review under the Equal Protection Clause.").

in this State, as authorized under the laws of this State, is a legal right" and enacting a shield law to protect such activity). The Defunding Provision "put[s] a thumb on the scales [to] influence [Maine's] decision as to how to shape its own [abortion] laws" by forcing MFP to stop providing abortion care to receive Medicaid funding for essential reproductive health care, *Windsor*, 570 U.S. at 771 (citation omitted)—which is "strong evidence" that targeting a disfavored group is the real basis for the provision. But this is not a rational explanation, and all other justifications fail.

*First*, the Defunding Provision is not rationally related to preventing federal Medicaid funds from being used for abortions outside of the narrow exceptions permitted under the Hyde Amendment; the Hyde Amendment already prohibits exactly that and has done so for almost half a century. Departments of Labor and Health, Education, and Welfare Appropriation Act of 1977, Pub. L. No. 94-439, § 209, 90 Stat. 1418, 1434 (1976); Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, §§ 506, 507, 138 Stat. 460, 703 (2024). Such duplication "necessarily casts considerable doubt upon the proposition that the [law] could rationally have been intended to prevent those very same abuses." *Moreno*, 413 U.S. at 537.

Moreover, MFP has been the Title X grantee for the state of Maine for over 50 years and has never been found to have misappropriated funding or failed to distinguish between federal funding for non-abortion services and separate funding for abortions. Kieltyka Decl. ¶ 25. To the extent the government asserts that the Defunding Provision is justified by an interest in preventing Medicaid from indirectly funding abortion, *e.g.*, Defs.' Opp'n Pls.' Mot. Prelim Inj. 14, *Planned Parenthood Fed'n of Am. v. Kennedy*, No. 1:25-cv-11913-IT (D. Mass. July 14, 2025), ECF No. 53, by allowing abortion providers to "free-up monies of its own which it then could apply to the abortion services," these arguments fail "as a matter of law": "the freeing-up theory cannot justify withdrawing all [Medicaid] funds from otherwise eligible entities merely because they engage in

13

abortion-related activities disfavored by the [S]tate." *Planned Parenthood of Cent. & N. Ariz. v. Arizona*, 718 F.2d 938, 945 (9th Cir. 1983); *Planned Parenthood of Minn.*, 612 F.2d at 361 (rejecting "freeing-up" theory under rational basis because plaintiff "routinely receives restricted funding which is carefully controlled and monitored," including funds prohibited from being used for abortion); *Ohio v. Becerra*, 87 F.4th 759, 790 (6th Cir. 2023) (Moore., J., concurring in judgment and dissenting in part) (rejecting "freeing-up" theory).

Regardless, these justifications are plainly irrational when "there is no evidence or even allegation that [MFP] has improperly used any state or federal funding for abortion services." *Planned Parenthood of Cent. N.C. v. Cansler*, 804 F. Supp. 2d 482, 497 (M.D.N.C. 2011); *see* Kieltyka Decl. ¶ 25; *accord Planned Parenthood of Greater Ohio v. Hodges*, 188 F. Supp. 3d 684, 694 (S.D. Ohio 2016) ("Defendants do not claim that any of the funds . . . have ever been used to fund abortions. Instead, it appears that the interest of Ohio. . . was to have Plaintiffs get out of the business of termination of pregnancy." (internal quotation marks omitted)). Nor is there any plausible reason for summarily excluding MFP when other Medicaid providers—including those entities who have been convicted of serious criminal offenses like fraud or patient neglect or abuse—are guaranteed individualized process before they are terminated or excluded from Medicaid. *See, e.g.*, 42 C.F.R. pt. 1001, subparts E-F; *id.* pt. 1003, subpart O; MaineCare Benefits Manual ch. I, § 1.23-1 (codified at 10-144 Me. Code R. ch. 101, § 1.23-1).

**Second**, the Defunding Provision is not rationally related to furthering an interest in reducing abortions, encouraging childbirth, or respecting prenatal life. Prohibiting federal Medicaid funding for *non-abortion care* to a provider simply because the provider also offers abortion care with *separate* funding does not further this interest. *See Cansler*, 804 F. Supp. 2d at 496 (finding that a similar funding ban was not needed to ensure that funds are not used for abortion

14

and that evidence showed the real justification for ban was animus). Defunding almost 90 percent of the care MFP's patients receive (family planning services like contraception counseling, cancer screenings, and annual gynecological exams, and primary care services like geriatric health services and management of asthma, diabetes, and menopause), *see* Kieltyka Decl. ¶ 11, is not related to a purported interest in reducing abortions, encouraging childbirth, or respecting prenatal life.

**Third**, the Defunding Provision is not rationally related to "preventing wasteful spending," H.R. 1, subchapter B, as the Defunding Provision will cost taxpayers $52 million over the next ten years, and an additional $1 million is set aside for implementation costs for fiscal year 2026 alone. *Supra* p. 6; *see Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d 1, 13 (1st Cir. 2012) (rejecting interest in "preserving scarce government resources" because a "more detailed recent analysis indicates that DOMA is more likely on a net basis to cost the government money"). To the extent the Defunding Provision is intended to "prevent[] wasteful spending" generally, there is no plausible explanation for why the law only targets abortion providers or why the law only targets ECPs, who serve "predominantly low-income, medically underserved individuals," 45 C.F.R. § 156.235(c)—by definition, the very individuals who are most likely to be on Medicaid. *See, e.g.*, *Moreno*, 413 U.S. at 537 (noting disproportionate impact on needy single mothers in multifamily households, though targeted group, hippies "likely to abuse the program," could easily avoid exclusion from the Food Stamp Act and subvert interest in preventing fraud). Regardless, "concern for the preservation of resources standing alone can hardly justify the classification used in allocating those resources. The State must do more than justify its classification with a concise expression of an intention to discriminate." *Plyler v. Doe*, 457 U.S. 202, 227 (1982); *see also, e.g.*, *Ranschburg v. Toan*, 709 F.2d 1207, 1211 (8th Cir. 1983) ("[I]t is untenable to suggest that a state's

decision to favor one group of recipients over another by itself qualifies as a legitimate state interest. An intent to discriminate is not a legitimate state interest."). Thus, the Defunding Provision fails rational basis. MFP is likely to succeed on its equal protection claim, and a temporary restraining order and/or preliminary injunction is justified.

## II.    MFP and Its Patients Are Suffering—and Will Continue to Suffer—Irreparable Injury Without Relief.

MFP and its patients are already suffering irreparable harm, will continue to suffer irreparable harm, and cannot wait until the conclusion of this litigation for relief. As an initial matter, without court intervention, MFP's Medicaid patients will be denied essential health care. MFP has already begun turning away new Medicaid patients seeking primary care and will be forced to continue doing so, forcing many of these patients to delay or forgo critical preventative care and management of chronic conditions like diabetes. Kieltyka Decl. ¶¶ 7, 11, 18–20, 22, 26–27, 29, 34. Without Medicaid funding, MFP will be forced to discharge all of its Medicaid primary care and family planning patients no later than October 31, 2025, and will have to notify these patients of this discharge by September 30, 2025, at the latest. *Id.* ¶¶ 22, 26, 29. Put differently, in two months, as a result of the Defunding Provision, thousands of patients will receive letters informing them that they can no longer receive care from MFP. *Id.* Many of these Medicaid patients will be unable to find a new provider, and those who do may have to travel long distances and face months-long wait times before they can see a provider who accepts Medicaid. *See supra* p. 7. This "disruption or denial of . . . patients' health care cannot be undone after a trial on the merits," and constitutes irreparable harm. *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1236 (10th Cir. 2018); *Rio Grande Cmty. Health Ctr. Inc. v. Rullan*, 397 F.3d 56, 76–77 (1st Cir. 2005) (affirming finding that denial of Medicaid patients' access to health services constitutes an irreparable harm); *see also Mass. Ass'n of Older Ams. v. Sharp,* 700 F.2d 749, 753 (1st Cir. 1983)

("Termination of benefits that causes individuals to forgo such necessary medical care is clearly irreparable injury."); *Mediplex of Mass., Inc. v. Shalala*, 39 F. Supp. 2d 88, 98–99 (D. Mass. 1999) (finding harms to third-party patients relevant to irreparable harm analysis).

Moreover, without Court intervention, the Defunding Provision will hinder MFP's continued operation. Turning away new patients, as MFP is already doing, and discharging existing patients, as MFP will have no choice but to do in short order, permanently ruptures patient-provider relationships that MFP has worked decades to build and causes confusion amongst patients about whether MFP is being precluded from Medicaid because it has done something wrong. *See* Kieltyka Decl. ¶¶ 22, 26, 29, 33, 36. Such "harm to goodwill, like harm to reputation, is the type of harm not readily measurable or fully compensable in damages." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989). The Defunding Provision places MFP between a rock and a hard place: either forgo all Medicaid funding and jeopardize its continued operations and ability to serve primary care and family planning patients, or stop providing abortions altogether to receive Medicaid for its other health care services.

Additionally, without court intervention, MFP will be forced to severely limit or end its services and to cut staff, which would prevent MFP from fulfilling its mission to "ensure that all people have access to high-quality, culturally relevant and affordable sexual and reproductive health care." Kieltyka Decl. ¶ 6; *see Victim Rts. L. Ctr. v. U.S. Dep't of Educ.*, No. CV 25-11042-MJJ, 2025 WL 1704311, at *18 (D. Mass. June 18, 2025) ("Actions by a defendant that make it more difficult for an organization to accomplish its primary mission provide injury for purposes of irreparable harm." (citation modified)); *Coastal Cntys. Workforce, Inc. v. LePage*, 284 F. Supp. 3d 32, 59 (D. Me. 2018) ("An imminent threat to the movant's [business] survival constitutes irreparable harm."); *accord Dr. José S. Belaval, Inc. v. Peréz-Perdomo*, 465 F.3d 33, 36 n.2 (1st

Cir. 2006) (finding irreparable injury to community health center from government's failure to make Medicaid payments).

In sum, MFP has already been forced to stop accepting new Medicaid primary care patients and, absent court intervention, will be forced to continue to do so in addition to discharging current Medicaid patients—even though many of these patients cannot afford or access care elsewhere. MFP will be forced to restrict services, cut staff, or even close clinics, exacerbating the dearth of health care providers. MFP and its patients are suffering—and will continue to suffer—irreparable harm, and a temporary injunction and/or preliminary injunction is warranted.

## III.    The Balance of Equities and Public Interest Weigh in Favor of Granting Relief.

When—as here—the government is a party, the balance of equities and public interest factors merge. *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Both of these factors strongly weigh in favor of granting injunctive relief here.

First, allowing MFP to continue to provide the essential care that it has provided for decades—and allowing MFP's patients to continue to access such care—is consistent with "the purpose of a preliminary injunction," which is "to preserve the status quo *before* the merits have been resolved."[7] *Francisco Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 19 (1st Cir. 2009) (emphasis in original). MFP has been serving low-income patients for decades, and both MFP and its patients have relied on its continuing ability to do so. MFP built its patient network and locations based on the belief that it would be able to continue to see Medicaid patients and receive Medicaid

---

[7] This Court should exercise its authority to craft its order to ensure that the status quo is in fact preserved by preventing retroactive enforcement of the Defunding Provision. *See, e.g.*, *Ex parte Young*, 209 U.S. 123, 147–48 (1908) (plaintiff must be able to challenge government action without facing "penalties for disobedience" that are "so enormous . . . as to intimidate . . . from resorting to the courts to test the validity of the legislation"); Michael T. Morley, *Erroneous Injunctions*, 71 Emory L.J. 1137, 1144 (2022) ("[E]ven an erroneous injunction that is no longer in effect permanently limits the manner and extent to which a wrongfully enjoined party may retroactively enforce its rights against the plaintiff for the plaintiff's actions while the injunction was in force.").

18

reimbursement. *See Lemon v. Kurtzman*, 411 U.S. 192, 203 (1973) ("It is well established that reliance interests weigh heavily in the shaping of an appropriate equitable remedy."). Meanwhile, Defendants will suffer no meaningful harm if they are required to continue covering the costs of services for MFP's Medicaid patients while this litigation proceeds. *Marlo M. ex rel. Parris v. Cansler*, 679 F. Supp. 2d 635, 638 (E.D.N.C. 2010) (finding balance of equities favored plaintiff where injunction would require the state "to maintain the funding [it] ha[s] provided to Plaintiff[ ] for years"); *accord* Am. TRO 8, *Planned Parenthood Fed'n of Am. v. Kennedy*, No. 1:25-cv-11913 (D. Mass. July 11, 2025), ECF No. 46 (TRO "does not compel Defendants to spend money they would not otherwise spend" because if "patients are able to find alternative providers, Defendants would reimburse those providers" and, if not, "in the longer term," "patients would still need the same services (and possibly additional care if a delay in obtaining screening or preventive treatments results in medical complications)").

Second, stripping funding from a provider that serves low-income patients with the fewest health care options—and is the sole medial provider that many of its patients see in a year—is not in the public interest. *Rio Grande Cmty. Health Ctr.*, 397 F.3d at 77 (shutdown of health clinic "would adversely affect hundreds of Medicaid patients," so public interest supported preliminary injunction); *Beverly Enters. v. Mathews*, 432 F. Supp. 1073, 1079 (D.D.C. 1976) ("both Congress and the Secretary have recognized the potential harm involved in [cutting off provider funding] and the compelling public interest in providing timely and uninterrupted health care funding").

Third, "the public has an important interest in making sure government agencies follow the law," which is furthered by preventing enforcement of an unconstitutional law. *See Neighborhood Ass'n of The Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005), *aff'd*, 463 F.3d 50 (1st Cir. 2006). Thus, the balance of equities and the public interest weigh in

favor of MFP.

Because all four factors weigh in favor of MFP, a temporary restraining order and/or preliminary injunction is justified.

## IV. The Court Should Require No Bond or a Nominal Bond.

Under Federal Rule 65(c), a court may order a bond when issuing a preliminary injunction. "[T]here is ample authority for the proposition that provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond." *Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*, 925 F.2d 6, 9 (1st Cir. 1991). Indeed, in recent cases challenging the legality of actions by federal agencies, courts have exercised their discretion to waive the requirement to post a bond. *See, e.g., Nat'l Council of Nonprofits v. Off. of Mgmt.*, No. CV 25-239 (LLA), 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) ("In a case where the government is alleged to have unlawfully withheld [funding] . . . it would defy logic . . . to hold Plaintiffs hostage for the resulting harm."). If the Court is inclined to require a bond, Plaintiff respectfully requests that the bond be nominal, as is the practice in this Circuit in cases where a bond is required. *See Maine v. U.S. Dep't of Agric.*, No. 25-cv-00131, 2025 WL 1088946, at *29–30 (D. Me. Apr. 11, 2025) (collecting cases); Am. TRO 8, *Planned Parenthood Fed'n of Am. v. Kennedy*, No. 1:25-cv-11913 (D. Mass. July 11, 2025), ECF No. 46 (requiring nominal bond).

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for a temporary restraining order and/or preliminary injunction should be granted and Defendants, their agents, employees, successors, and anyone acting in concert or participation with them should be enjoined from enforcing, retroactively enforcing, or otherwise applying the Defunding Provision against MFP.

Dated: July 16, 2025                              Respectfully submitted,

/s/ Taylor Asen

Taylor Asen
Rosalie B.C. Wennberg
GIDEON ASEN LLC
95 Main St 4th Floor, #5
Auburn, ME 04210
207-206-8982
tasen@gideonasenlaw.com
rwennberg@gideonasenlaw.com

Meetra Mehdizadeh*
Astrid Marisela Ackerman*
CENTER FOR REPRODUCTIVE RIGHTS
199 Water Street, 22nd Floor
New York, New York 10038
(917) 637-3788
mmehdizadeh@reprorights.org
aackerman@reprorights.org

Faith Gay*
SELENDY GAY PLLC
1290 Avenue of the Americas 20th Floor
New York, NY 10104
(212) 390-9000
fgay@selendygay.com

*Attorneys for Plaintiff*

*\* Application for admission* pro hac vice
*forthcoming*

21