**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| THE FAMILY PLANNING ASSOCIATION OF MAINE D/B/A MAINE FAMILY PLANNING, | |
| Plaintiff, | CIVIL ACTION NO. 1:25-cv-00364-LEW |
| v. | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services; CENTERS FOR MEDICARE & MEDICAID SERVICES; And MEHMET OZ, in his official capacity as the Administrator of the Centers for Medicare & Medicaid Services, | |
| Defendants. | |

***AMICUS CURIAE* BRIEF OF THE
AMERICAN CENTER FOR LAW & JUSTICE
IN SUPPORT OF DEFENDANTS**

1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTEREST OF AMICUS .......................................................................................... 1

SUMMARY OF ARGUMENT ................................................................................... 1

ARGUMENT .............................................................................................................. 3

   I.    There is no constitutional right to subsidies for abortion providers. .................................. 3

      A.   Supreme Court precedent has repeatedly emphasized that the government has no obligation to subsidize abortion providers. ........................................................................ 3

      B.   Congress has appropriate and necessary reasons for defunding MFP. ........................... 7

   II.   Compelling Congress to subsidize MFP would violate the separation of powers. ........... 10

CONCLUSION ............................................................................................................ 14

## TABLE OF AUTHORITIES

**Cases**

*Buckley v. Valeo*, 424 U.S. 1, 124 (1976) ........................................................................ 11

*California v. Azar*, 950 F.3d 1067 (9th Cir. 2020) ............................................................ 4

*Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937) ..................................... 11

*Colorado Republican State Central Committee v. Anderson*, U.S. No. 23-696 (2023) .................... 1

*Dep't of Navy v. FLRA*, 665 F.3d 133 (D.C. Cir. 2012) .................................................... 11

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) ........................................ 1

*Doe v. Gillespie*, 867 F.3d 1034 (8th Cir. 2017) ............................................................... 7

*Fischer v. United States*, 144 S. Ct. 2176 (2024) ............................................................. 1

*Harris v. McRae*, 448 U.S. 297 (1980) ...................................................................... 3, 5, 6

*Harris v. Olszewski*, 442 F.3d 456 (6th Cir. 2006) ......................................................... 8

*Holder v. Humanitarian Law Project*, 561 U.S. 1, 31 (2010) ........................................ 9

*INS v. Pangilinan*, 486 U.S. 875, 883 (1988) ................................................................. 12

*Maher v. Roe*, 432 U.S. 464 (1977) ......................................................................... 3, 4, 5

*McDonnell v. United States*, 579 U.S. 550 (2016) ........................................................... 1

*Office of Personnel Mgmt. v. Richmond,* 496 U.S. 414, 424 (1990) ........................... 11, 12

*Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960, 963 (9th Cir. 2013) ................... 7

*Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908 (6th Cir. 2019) ............... 4

*Planned Parenthood of Greater Tex. Fam. Plan. & Preventative Health Servs., Inc. v. Kauffman,*
981 F.3d 347 (5th Cir. 2020) ........................................................................................ 7

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 967 (7th
Cir. 2012) .................................................................................................................... 8

*Planned Parenthood of Kan. & Mid-Mo. v. Andersen*, 882 F.3d 1205, 1213-14 (10th Cir. 2018) .... 7

*Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 546 (1983)................................ 8, 9

*Roe v. Wade*, 410 U.S. 113, 164 (1973)........................................................................... 4

*Rust v. Sullivan*, 500 U.S. 173 (1991)........................................................... 3, 4, 6, 7, 9

*Trump v. CASA, Inc.*, __ U.S. __, __ (2025)................................................................ 12

*Trump v. United States*, 603 U.S. 593 (2024).............................................................. 1

*Trump v. Vance*, 591 U.S. 786 (2020) ........................................................................ 1

*United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016) ........................................ 11

**Constitutional Provisions**

U.S. Const. art. I, § 9, cl. 7................................................................................... 11

**Other Authorities**

The Federalist No. 47 (James Madison) ...................................................................... 10

The Federalist No. 51 (James Madison) ...................................................................... 10

The Federalist No. 58 (James Madison) ...................................................................... 10

**INTEREST OF AMICUS[1]**

This case involves an assault on the separation of powers and Congress's authority to choose not to fund abortion or abortion providers. The American Center for Law & Justice ("ACLJ") is an organization dedicated to the defense of constitutional liberties and principles secured by law, including separation of powers, and the sanctity of life. ACLJ attorneys argued numerous cases before the Supreme Court of the United States, *e.g.*, *Colorado Republican State Central Committee v. Anderson*, U.S. No. 23-696 (2023); *Trump v. Vance*, 591 U.S. 786 (2020); or as amici, *e.g.*, *Trump v. United States*, 603 U.S. 593 (2024); *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022); *Fischer v. United States*, 603 U.S. 480 (2024); and *McDonnell v. United States*, 579 U.S. 550 (2016). The ACLJ has dedicated time and effort to defending and protecting Americans' constitutionally protected freedoms and has a fundamental interest in maintaining the integrity of the founders' constitutional design. This includes supporting the separation of powers and the ability of the Congress to choose not to appropriate funds in support of abortion or abortion providers.

**SUMMARY OF ARGUMENT**

Plaintiff Family Planning Association of Maine d/b/a Maine Family Planning. ("MFP") asks the Court to do something unprecedented: order Congress to spend money it has specifically voted not to spend. The answer should be an emphatic no. Two fundamental principles compel this conclusion.

---

[1] No party's counsel in this case authored this brief in whole or in part. No party or party's counsel contributed any money intended to fund preparing or submitting this brief. No person, other than amici, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

First, there is no constitutional right to government subsidies for abortion or abortion providers. The Supreme Court settled this question decades ago in *Maher v. Roe, Harris v. McRae,* and *Rust v. Sullivan*. The Constitution may limit the government's ability to punish or regulate conduct, but it does not require the government to pay for that conduct. A refusal to fund is not a penalty—it is simply a choice not to subsidize. That choice is particularly appropriate here, where Congress has made the reasonable policy judgment that federal dollars should not directly or indirectly support abortions. Because money is fungible, making Medicaid payments to MFP for permitted services ultimately allows more resources for abortion procedures that Congress is not willing to support. Nothing in the Constitution prevents Congress from acting to address that concern.

Second, ordering Congress to spend money it has declined to appropriate would violate the separation of powers. The Appropriations Clause reserves the power of the purse exclusively to Congress. Courts cannot compel Congress to spend money any more than Congress can compel courts to decide cases. The relief Plaintiff seeks—an injunction forcing Congress to fund its operations—would transform federal judges into super-legislators empowered to redirect public resources according to judicial rather than legislative priorities.

These principles are not merely academic. They protect the fundamental structure of our constitutional system. The power to tax and spend belongs to those most accountable to the people whose money is being spent. When Congress makes the considered judgment that federal funds should not support abortion providers, that judgment deserves judicial respect, not judicial override. The Constitution provides no warrant for courts to second-guess such policy choices, much less to order their reversal through the extraordinary remedy of mandated appropriations.

## ARGUMENT

I.    **There is no constitutional right to subsidies for abortion providers.**

There is one core problem at the heart of MFP's case. MFP seeks to claim a constitutional right to be subsidized by the taxpayer. There is no such right. On the contrary, there is a fundamental distinction between governmental interference with conduct and governmental decisions about what activities merit public funding. Congress has ample authority to choose not to subsidize activities like abortion and to promote life instead. This lawsuit against Congress's appropriations decisions should fail for this fundamental reason.

A.    **Supreme Court precedent has repeatedly emphasized that the government has no obligation to subsidize abortion providers.**

The Supreme Court has long recognized a basic truth: the government need not subsidize an action just because it is lawful. This principle has led the Supreme Court to consistently hold that while the Constitution may prevent the government from placing obstacles in the path of protected conduct, it does not require the government to fund activities that run counter to its policy judgments. Even while *Roe* had created a so-called "right" to abortion, from *Maher v. Roe* through *Harris v. McRae* to *Rust v. Sullivan*, the Supreme Court consistently held that the government may constitutionally make policy and value judgments in allocating public funds under government programs and is not required to subsidize abortion by including coverage for abortion in public-benefits programs. *Maher v. Roe*, 432 U.S. 464, 470-71, 474 (1977) (rejecting challenge to Connecticut Welfare Department regulation limiting state Medicaid benefits for first-trimester abortions to those that are medically necessary); *Harris v. McRae*, 448 U.S. 297, 322-23 (1980) (rejecting challenge to Medicaid Act's Hyde Amendment's limitation of funding to those abortions necessary to save life of mother, while permitting funding of costs associated with childbirth); *Rust*

3

*v. Sullivan*, 500 U.S. 173, 192-94 (1991) (rejecting challenge to regulations providing funding for family-planning services but prohibiting funds for abortion counseling and referral).

The doctrine is as simple as it is settled: when Congress appropriates public funds to establish a program, it is entitled to define that program's limits. That includes the Medicaid funding MFP seeks to claim for itself. A refusal to fund an activity, without more, cannot be equated with the imposition of a penalty on that activity. To hold otherwise would be to conflate the government's role as sovereign with its role as patron, effectively conscripting taxpayers to subsidize activities their representatives have determined warrant no public support. MFP fundamentally misunderstands constitutional principles, attempting to twist the Constitution's guarantee of negative liberty into a supposed right to taxpayer-funded support—a distortion the Supreme Court consistently and rightly rejected. Plaintiff completely ignores the federal government's legitimate interest in favoring childbirth through the allocation of (or refusal to allocate) taxpayer dollars.

Even under the *Roe* regime, the Supreme Court consistently recognized the interest of the government in preventing federal money from being used for abortion. *See Rust*, 500 U.S. at 200-01 (upholding 1988 federal regulations prohibiting the use of Title X money to perform, promote, refer for, or support abortion as a method of family planning). *Roe* itself acknowledged the government's "interest in the potentiality of human life." *Roe v. Wade*, 410 U.S. 113, 164 (1973). Circuit courts have likewise acknowledged the state's fundamental interests in valuing and promoting childbirth over abortion. *See, e.g., California v. Azar*, 950 F.3d 1067 (9th Cir. 2020) (en banc) (upholding 2018 federal regulations prohibiting the use of Title X money to perform, promote, refer for, or support abortion as a method of family planning); *Planned Parenthood of*

*Greater Ohio v. Hodges*, 917 F.3d 908 (6th Cir. 2019) (en banc) (upholding Ohio law that prohibited abortion organizations from participating in six state health education programs).

*Rust, Maher,* and *McRae* are dispositive. *Maher*, 432 U.S. 464, upheld a state welfare regulation under which Medicaid recipients received payments for services related to childbirth, but not for nontherapeutic abortions. The Supreme Court, only a few years after *Roe*, rejected the claim that this unequal subsidization was a violation of the Constitution. *Id.* The Court held that the government may "make a value judgment favoring childbirth over abortion, and . . . implement that judgment by the allocation of public funds." *Id.* at 474. *Maher* anchors this case. The Supreme Court's holding that states need not subsidize abortions through Medicaid holds even more firmly when applied to the federal government. "There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." *Id.* at 475.

"A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity." *McRae*, 448 U.S. 297, 317 n. 19. In *McRae*, the Supreme Court upheld the Hyde Amendment in the face of legal challenges like the present case, holding that the Hyde Amendment's restrictions on federal Medicaid funding for abortions did not violate the Constitution. There, the Court rejected plaintiffs' Due Process Clause challenge, ruling that the government has no constitutional obligation to subsidize the exercise of even fundamental rights— of which abortion is not—and that the Hyde Amendment posed no governmental barrier to a woman seeking an abortion. Rather, it encouraged childbirth (in which the state has a legitimate interest) over abortion through the allocation of public funds. *Id.* at 317-18. The Court again distinguished funding restrictions from direct governmental interference, emphasizing that the government need not remove obstacles like indigency. *Id.* at 316. In *McRae* the government's

refusal to subsidize "medically necessary" abortions despite its decision to subsidize other medically necessary health procedures did "not impinge on the due process liberty [to terminate a pregnancy] recognized in [*Roe v.*] *Wade*." *Id.* at 318. The refusal to provide such funding left the appellees "with at least the same range of choice in deciding whether to obtain a medically necessary abortion as [they] would have had if Congress had chosen to subsidize no health care costs at all." *Id.* at 317. The Court indicated that the government may sponsor health care programs for pregnant women without sponsoring abortion, because "it simply does not follow that a woman's freedom of choice carries with it a constitutional entitlement to the financial resources to avail herself of the full range of protected choices." *Id.* at 316.

In *Rust*'s challenge to health department regulations limiting the ability of Title X fund recipients to engage in abortion-related activities, the Supreme Court rejected First Amendment and Fifth Amendment arguments similar to the ones MFP advances here, such as claims of viewpoint discrimination or denial of equal protection. *Rust*, 500 U.S. at 192-93 (sustaining a prohibition on abortion-related advice by recipients of federal funds designated for family-planning counseling). "A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity. There is a basic difference between direct state interference with a protected activity and state encouragement of alternative activity consonant with legislative policy." *Id.* at 193 (internal quotations omitted).  The Supreme Court held that the "mere decision to exclude abortion-related services from a federally funded *preconceptional* family planning program" could not "impermissibly burden" a woman's right to obtain an abortion. *Id.* at 201-02. As it explained, "[t]he Government has no constitutional duty to subsidize an activity merely because the activity is constitutionally protected," and instead "may validly choose to fund childbirth over abortion." *Id.* at 201. Although "[i]t would undoubtedly be easier

for a woman seeking an abortion if she could receive" abortion information "from a Title X project," there is no constitutional requirement that "the Government distort the scope of its mandated program" to provide it. *Id.* at 203. "The difficulty that a woman encounters when a Title X project does not provide abortion counseling or referral," for instance, "leaves her in no different position than she would have been if the Government had not enacted Title X." *Id.* at 202.

The *Rust* Court established that the government may constitutionally engage in selective funding to encourage activities it deems in the public interest without simultaneously funding alternative approaches to the same problem, and that such selective funding does not constitute viewpoint discrimination or unequal treatment. *Id.* at 193. This was true even when abortion was incorrectly considered by the Supreme Court to be a "constitutional right." The bottom line is clear: "when the Government appropriates public funds to establish a program it is entitled to define the limits of that program." *Id.* at 194. Rather than denying organizations the right to engage in abortion-related activities, Congress simply declined to subsidize such activities with public funds: "Congress has merely refused to fund such activities out of the public fisc[.]" *Id.* at 198. The Supreme Court has made clear that the government can choose not to fund abortion providers or procedures. Congress did not ban abortion-related activities; it just decided not to pay for them—a choice it has every right to make.

### B. Congress has appropriate and necessary reasons for defunding MFP.

When it defunded abortion providers, such as MFP, Congress did not act in a vacuum. Congress's decision reflects a broader policy judgment shared by governments at multiple levels. Many states have reached similar conclusions about funding abortion providers, based on their own assessments of the competing priorities in healthcare spending of preserving and promoting life. *Planned Parenthood of Greater Tex. Fam. Plan. & Preventative Health Servs., Inc. v.*

*Kauffman*, 981 F.3d 347, 351 (5th Cir. 2020) (en banc) (Texas disqualified Planned Parenthood as a Medicaid provider because of substantial evidence that Planned Parenthood engaged in unethical conduct involving the sale of fetal tissue.); *Doe v. Gillespie*, 867 F.3d 1034, 1038 (8th Cir. 2017) (Arkansas Governor announced that because Planned Parenthood "does not represent the values of the people of our state and Arkansas is better served by terminating any and all existing contracts with them."); *Planned Parenthood of Kan. & Mid-Mo. v. Andersen*, 882 F.3d 1205, 1213-14 (10th Cir. 2018) (Medicaid contracts with Planned Parenthood terminated for several reasons, including "unethical or unprofessional conduct."); *Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960, 963 (9th Cir. 2013) (Arizona law prohibiting state contracts of any kind with abortion providers); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 967 (7th Cir. 2012) (Indiana law prohibiting state agencies from providing state or federal funds to abortion clinics served the state's interest in "eliminat[ing] the indirect subsidization of abortion."); *Harris v. Olszewski*, 442 F.3d 456 (6th Cir. 2006). These decisions—whether made by state legislatures, governors, or federal representatives—involve the same fundamental question: how to allocate limited public resources among competing healthcare needs. The Constitution does not require any level of government to privilege one healthcare provider over others, particularly when that provider's activities conflict with the funding authority's policy goals in promoting and preserving life. The state can appropriately choose not to subsidize abortions or abortion providers.

Just a few weeks ago, the Supreme Court upheld South Carolina's decision not to provide Medicaid to Planned Parenthood, concluding that the relevant statute did not create a right to sue. *Medina v. Planned Parenthood S. Atl.*, No. 23-1275, 2025 U.S. LEXIS 2492, at *2 (June 26, 2025) ("Citing state law prohibiting public funds for abortion, South Carolina in July 2018 determined that Planned Parenthood could no longer participate in the State's Medicaid program.") The

Supreme Court affirmed South Carolina's right to exclude abortion providers from its Medicaid that Planned Parenthood lacked an enforceable right to sue South Carolina to stay on the state Medicaid program. *Id.* at *35.

While a case that does not directly concern abortion, *Regan v. Taxation With Representation of Washington* is illustrative. In that case, the Supreme Court upheld a requirement that nonprofit organizations seeking tax-exempt status under 26 U.S.C. §501(c)(3) not engage in substantial efforts to influence legislation. *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 546 (1983) (dismissing "the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State" (internal quotation marks omitted)). The tax-exempt status, the Supreme Court explained, "ha[d] much the same effect as a cash grant to the organization." *Id.* at 544. A corporation challenged the statute arguing, among other things, that "Congress' decision not to subsidize its lobbying violate[d] the First Amendment [because] the prohibition against substantial lobbying by § 501(c)(3) organizations impose[d] an 'unconstitutional condition' on the receipt of tax-deductible contributions." *Id.* at 545 (citation omitted) (bracketed alterations supplied). The Court discussed the nature of tax exemptions and tax deductions and concluded that tax exemptions are a form of subsidy. By limiting that benefit, § 501(c)(3) status, to organizations that did not attempt to influence legislation, Congress had merely "chose[n] not to subsidize lobbying." *Id.* at 544. Congress did not limit the organization's ability to lobby the government in any way. *See id.* at 545. Instead, Congress merely "chose not to subsidize lobbying" by limiting the availability of Section 501(c)(3) tax-exempt status. *Id.* at 544.

It is true that federal Medicaid does not, itself, cover abortions, thanks to the Hyde Amendment upheld in *McRae*. But MFP ignores a critical reality: "[m]oney is fungible." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 31 (2010). Money MFP receives from Medicaid to

subsidize one service is money that it can then utilize to perform another action, namely, abortion. When the government provides funding to an organization for permitted activities, those funds free up other resources that can be redirected toward activities the government prefers not to support. Congress has consistently sought to ensure that federal dollars do not indirectly subsidize abortions, even when not directly funding them. The constitutional question is not whether this indirect effect exists, but whether Congress may reasonably act to prevent it. Decades of precedent, from *Maher* through *Rust*, confirm that it may. To ignore this reality would be to permit constitutional end-runs around legitimate policy choices made by the people's elected representatives.

The Constitution does not require that the government fund all family-planning activities equally. Congress is not taking action regarding MFP's speech or its views. *Rust*, 500 U.S. at 193 ("There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy."). Instead, Congress, as precedent clearly allows, chose to prevent federal funds from being used for abortion in any manner, direct or indirect.

## II.    Compelling Congress to subsidize MFP would violate the separation of powers.

"No political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty, than" the Constitution's separation of powers. The Federalist No. 47 (James Madison). MFP seeks the extraordinary relief of compelling Congress to spend funds for its benefit. Plaintiff seeks an "injunction" that would force the federal government to disburse money Congress has not appropriated—indeed, funds that Congress expressly declined to appropriate.

10

Congress enacts appropriations and the President, as the chief of the executive branch, is given the authority and responsibility to administer public funds, to oversee their disbursement, and to ensure that funds are distributed in accordance with law. The power over the purse is one of the most important authorities allocated to Congress in the Constitution's "necessary partition of power among the several departments." The Federalist No. 51 (James Madison); *see also* The Federalist No. 58 (James Madison) ("This power over the purse may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people, for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure.").

Plaintiff demands the extraordinary remedy of forcing Congress to spend taxpayer dollars to subsidize MFP. This lawsuit presents an extreme attempt to usurp Congress's constitutional authority to control the power of the purse. The injunctive relief sought by the Plaintiff, if granted, would directly violate Article I of the Constitution. The Constitution's text could hardly be clearer: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. These words establish a straightforward rule—Congress, and Congress alone, controls federal spending. The Framers placed this power in the legislative branch for good reason: those closest to the people should determine how the people's money is spent.

What Plaintiff seeks here—a judicial command forcing Congress to appropriate funds it has declined to appropriate—would invert this constitutional design. Courts cannot compel Congress to spend money any more than Congress can compel courts to decide cases. The Appropriations Clause's words convey a "straightforward and explicit command": no money "can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Off. of Pers. Mgmt. v. Richmond,* 496 U.S. 414, 424 (1990) (*quoting Cincinnati Soap Co. v. United States*, 301

11

U.S. 308, 321 (1937)) (internal quotation marks omitted); *See Dep't of Navy v. FLRA*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (Kavanaugh, J.) (describing Congress's "exclusive power over the federal purse").

Congress and only Congress has authority to expend public funds. "The Clause has a 'fundamental and comprehensive purpose . . . to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents.'" *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016) (quoting *Richmond*, 496 U.S. at 427-28). It "protects Congress's exclusive power over the federal purse," and "prevents Executive Branch officers from even inadvertently obligating the Government to pay money without statutory authority." *FLRA*, 665 F.3d at 1346-47 (internal quotation marks and citations omitted).

 "The principle of separation of powers was not simply an abstract generalization in the minds of the Framers: it was woven into the document that they drafted in Philadelphia in the summer of 1787." *Buckley v. Valeo*, 424 U.S. 1, 124 (1976). The Appropriations Clause's "straightforward and explicit command" ensures Congress's exclusive power over the federal purse. *Richmond*, 496 U.S. at 424. Critically, "[a]ny exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Id.* at 425.

The Supreme Court has recently warned against the dangers of an "imperial Judiciary." *Trump v. CASA, Inc.*, No. 23-1275, 2025 U.S. LEXIS 2492, at *2 (June 26, 2025). Those dangers are illustrated by the relief the Plaintiff requests. Ordering Congress to appropriate money that it has not so appropriated is inconsistent with the separation of powers and the explicit command of the Constitution. Neither the executive nor the judiciary has authority to appropriate unauthorized

funds. Similarly, ordering the executive branch to draw monies from the Treasury, in defiance of an explicit Congressional decision not to appropriate them, is inconsistent with the separation of powers. In particular, the Supreme Court has made it undeniable that equitable relief "cannot grant respondent a money remedy that Congress has not authorized." *Richmond*, 496 U.S. at 426; *See INS v. Pangilinan*, 486 U.S. 875, 883 (1988) ("Courts of equity can no more disregard statutory and constitutional requirements than can courts of law."). Equitable relief can no more mandate an unauthorized expenditure than can the actions of the Executive.

The relief Plaintiff seeks here—an injunction compelling Congress to fund their operations—represents precisely the sort of judicial overreach the Framers designed our Constitution to prevent. The Appropriations Clause's "straightforward and explicit command" that no money shall be drawn from the Treasury without congressional appropriation stands as an insurmountable barrier to Plaintiff's unprecedented request. *Richmond*, 496 U.S. at 424. To grant the relief sought would not merely exceed judicial authority—it would invert the constitutional order, transforming courts from interpreters of law into super-legislators empowered to direct the expenditure of public funds according to their own policy preferences rather than those of the people's elected representatives. The Constitution's text, structure, and history all point to the same conclusion: Congress alone holds the power of the purse, and no court may compel it to open that purse against its will.

Consider what Plaintiff is really asking this Court to do. They want a federal judge to order Congress to spend money that Congress has specifically voted not to spend. This request misconceives the judicial role in our constitutional system. Courts interpret laws and ensure they comply with constitutional requirements—but they do not write appropriations bills or second-guess legislative priorities. If courts could force Congress to fund organizations dissatisfied with

13

its spending decisions, every budgetary choice would risk becoming a constitutional issue. The Constitution of the United States, however, assigns spending authority to the branch most accountable to the people whose money is at stake.

## CONCLUSION

For the foregoing reasons, Amicus Curiae American Center for Law and Justice respectfully asks this Court to deny the Plaintiff's Motion for a Temporary Restraining Order and/or Preliminary Injunction.

Dated: August 1, 2025                    Respectfully submitted,

OLIVIA F. SUMMERS*
(D.C. Bar No. 1017339)
/s/ Nathan J. Moelker
NATHAN MOELKER*
(VA Bar No. 98313)

THE AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Avenue, NE
Washington, D.C. 20002
Telephone: (202) 546-8890
Facsimile: (202) 546-9309
osummers@aclj.org

Stephen C. Whiting
THE WHITING LAW FIRM
75 Pearl Street
Suite 207
Portland, ME 04101
Bar No. 559
(207) 780-0681
steve@whitinglawfirm.com

*Counsel for proposed amicus curiae*

* Admitted Pro Hac Vice

## CERTIFICATE OF SERVICE

I, Nathan J. Moelker, hereby certify that on August 1, 2025, the foregoing document was filed electronically using the Court's CM/ECF system, which will send notification of this filing to all registered participants.

/s/ Nathan J. Moelker