UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| THE FAMILY PLANNING ASSOCIATION OF MAINE d/b/a MAINE FAMILY PLANNING, | ) ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | No. 1:25-cv-00364-LEW |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | ) ) ) ) | |
| ROBERT F. KENNEDY, JR. in his official capacity as Secretary of the Department of Health and Human Services, | ) ) ) ) ) | |
| CENTERS FOR MEDICARE & MEDICAID SERVICES, and | ) ) ) | |
| MEHMET OZ, in his official capacity as Administrator of the Centers for Medicare & Medicaid Services, | ) ) ) ) | |
| Defendants | ) | |

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, The Family Planning Association of Maine, seeks a judicial declaration that Defendants, a co-equal branch of government, its agency and appointed leadership, must continue to spend dollars in a way that is contrary to the will of the people as expressed by Congress. To overcome this constitutional inertia, Plaintiff presses into service the Equal Protection Clause. As explained below, Plaintiff's equal protection claim fails to hold the promise of flight due to several severe jurisprudential headwinds that I am

bound to observe, not the least of which are Congress's power of the purse, an exceedingly deferential standard of constitutional review I inherit from binding precedent, and the absence of the thermal lift that used to be available to Plaintiff and other abortion providers when abortion was considered a constitutional right, before the Supreme Court's opinion in *Dobbs v. Jackson's Women's Health Organization*, 597 U.S. 215, (2022) (removing the right to abortion from the list of fundamental rights protected by the United States Constitution). Consequently, for present purposes, Plaintiff's Motion for Preliminary Injunction (ECF No. 5) is denied.

## BACKGROUND

The recently enacted One Big Beautiful Bill Act[1] (hereafter the "BBB"), Pub. L. No. 119-21, H.R. 1, 119th Cong. (2025), in Subtitle B (Health), Chapter 1 (Medicaid), subchapter B (preventing wasteful spending), section 71113 (Federal payments to prohibited entities), withdraws all Medicaid funding from certain "prohibited entities," which Congress has defined as those that (1) have tax-exempt status under Internal Revenue Code section 501(c)(3); (2) are "essential community providers" under 45 C.F.R. § 156.235[2] "primarily engaged in family planning services, reproductive health, and related medical care"; (3) provide abortions to clients other than in the case of rape or incest or a pregnancy that exposes a woman to the "danger of death"; and (4) received in excess of $800,000 in Medicaid funding in fiscal year 2023. BBB § 71113(b)(1). In other words,

---

[1] *Available online at* https://www.congress.gov/bill/119th-congress/house-bill/1/text (last viewed Aug. 25, 2025).

[2] The Department of Health and Human Services defines essential community providers as Medicaid providers who operate in areas with a shortage of health care professionals. Two of Plaintiff's eighteen clinics qualify as essential community providers.

Section 71113 withdraws all federal Medicaid funding from certain "prohibited entities" having specific characteristics that, in combination, members of Congress might believe are the defining characteristics of major abortion providers in the United States.

Plaintiff meets all four parts of the definition and is, therefore, prohibited from receiving federal funds under the Medicaid program "for items and services" provided for a period of one year subsequent to the passage of the Act. *Id.* § 71113(a). Congress's prohibition against Plaintiff's receipt of federal Medicaid funds is selective insofar as the criteria that govern the prohibition do not all apply to Medicaid providers that provide abortion services other than those permitted under Medicaid (hereafter, "non-qualifying abortions") but operate on a for-profit basis; or that provide non-qualifying abortion services but do not qualify as essential community providers, which generally means that they operate in more economically viable areas[3] in which Medicaid beneficiaries have access to a number of different potential service providers; or that provide non-qualifying abortion services but are not primarily engaged in the provision of family planning and reproductive health care.

Plaintiff alleges that the relevant portion of the BBB deprives it of equal protection of the laws in connection with its participation as a provider in the State of Maine's Medicaid program. In combination with its Complaint (ECF No. 1), Plaintiff filed an Emergency Motion for a Temporary Restraining Order and/or Preliminary Injunction (ECF No. 5). Although filed as an emergency motion seeking an immediate restraining order, Plaintiff agreed that its motion should proceed on an expedited briefing schedule followed

---

[3] Urban providers of Medicaid services can qualify as essential community providers. The designation is not limited to providers serving remote areas.

by oral argument. With the aid of the parties' briefs, oral arguments, and exhibits, the Motion is now effectively a Motion for Preliminary Injunction. Plaintiff offers the following facts in support of its claim.

Approximately half of Plaintiff's patients are Medicaid recipients. Decl. of Evelyn Kieltyka (ECF No. 5-2) ¶ 5. Plaintiff operates eighteen family planning clinics, with at least one site in twelve of Maine's sixteen counties, plus a mobile clinic. Plaintiff's family planning clinics are located in Augusta, Bangor, Belfast, Calais, Damariscotta, Dexter, Ellsworth, Farmington, Fort Kent, Houlton, Lewiston, Machias, Norway, Presque Isle, Rumford, Skowhegan, Thomaston, and Waterville. Plaintiff also subcontracts with several other entities that in total provide access to sexual and reproductive health care in fifteen of Maine's sixteen counties. *Id.* ¶ 8.

Roughly 40 percent of Maine's population live in rural areas. Many patients live significant distances from Maine's population centers and find it difficult to access a health care provider. Moreover, due to Maine's challenging weather conditions, critical roads are often impassable during parts of the winter, particularly in rural Aroostook and Washington Counties. Kieltyka Decl. ¶ 9. Many of Plaintiff's direct service clinics are located in regions of the state designated by the U.S. Health Resources and Services Administration as Medically Underserved Areas. Health Res. & Servs. Admin., MUA Find, https://data.hrsa.gov/tools/shortage-area/mua-find (last visited Aug. 25, 2025). In some of these areas, it would be very difficult for Medicaid beneficiaries to access reproductive health care through any provider other than Plaintiff. For example, Plaintiff is the sole provider of comprehensive family planning and reproductive health care services in Norway and Farmington in western Maine, as well as in Washington County in eastern

Maine.  Kieltyka Decl. ¶ 10.

In terms of the services provided by Plaintiff in its own clinics, using figures from 2024, 7.38% of Plaintiff's patients received abortion services.  According to Plaintiff, this amounted to 645 abortion patients.  *Id.* ¶ 11.  According to Plaintiff, the only other publicly accessible health centers where a pregnant person can obtain abortion care in Maine are Planned Parenthood[4] of Northern New England clinics and the Mabel Wadsworth Center in Bangor.[5]  *Id.* ¶ 13.  Of these entities, only the Mabel Wadsworth Center is unaffected by the BBB's new funding prohibition.  According to Plaintiff's own anecdotal account, the BBB effectively targets two of the three primary providers of non-qualifying abortion services in Maine, excluding only the one lacking geographic distribution.

A fair assessment of Plaintiff's factual contentions indicates that there is a great demand throughout rural Maine and other underserved areas for Medicaid-funded family planning and reproductive health (and other) services, and that the demand is largely met by organizations that specialize in meeting these needs.  *Id.* ¶¶ 12, 17, 19, 33-35.  One other entity that might fit this description other than Plaintiff or Planned Parenthood of Northern New England is Greater Portland Health, but while it is a tax-exempt non-profit it does not provide abortion services.  *Id.* ¶ 15.

Plaintiff asserts that for its existing patients who rely on Medicaid to pay for family

---

[4] Planned Parenthood Federation of America has launched its own challenge to the BBB, which raises distinct legal questions and a less deferential standard of review than the instant case.  *See Planned Parenthood v. Kennedy*, No. 1:25-cv-11913, 2025 WL 2040123, at *12 (D. Mass, Jul. 21, 2025).

[5] MaineHealth Maine Medical Center allegedly provides abortion care, but it is a full-service health care entity that is not primarily focused on the provision of family planning and reproductive health services.  Kieltyka Decl. ¶ 16.  Furthermore, the scope of its operations and its organizational health are not heavily reliant on the receipt of Medicaid funding.

planning or primary care, it will continue to see them despite the impact of the BBB, but only through October 31, 2025. Plaintiff states that this change may result in the closure of some of its clinics. *Id.* ¶¶ 22, 26.[6]

Slightly less than one-quarter of Plaintiff's annual revenue comes from Medicaid, and roughly 62 percent of that one-quarter is federally funded.[7] *Id.* ¶¶ 23-24. The cessation of services and/or the closure of clinics would impact many patients, including some patients in remote regions with serious chronic conditions in need of follow-up services. *Id.* ¶¶ 27-28.

## ANALYSIS

Plaintiff alleges that the prohibition on its receipt of federal Medicaid funding violates the Equal Protection Clause of the Fifth Amendment of the United States Constitution because it arbitrarily and irrationally removes Plaintiff from the Medicare funding stream. Compl. ¶¶ 53-63 (ECF No. 1). Plaintiff asks this Court to declare as much and to enter a preliminary injunction that prohibits Defendants "from implementing or enforcing" what Plaintiff refers to as "the Defunding Provision." Compl. at 25; Emergency Mot. for Temporary Restraining Order and/or Preliminary Injunction (ECF No. 5); Mem. of Law at 1-2, 20 (ECF No. 5-3).

Preliminary injunctive relief is "an extraordinary and drastic remedy that is never

---

[6] With its Reply (ECF No. 25), Plaintiff has provided a Supplemental Declaration of Evelyn Kieltyka (ECF No. 25-1) that somewhat adjusts its prediction of harm. I address it in the context of the irreparable injury portion of the Analysis.

[7] Maine's Medicaid program, known as MaineCare, is jointly funded by the federal government and the State. The BBB does not restrict how Maine's own financial contributions to the program are spent. Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47 § 507(c) (Mar. 23, 2024). However, more than half of the funding for MaineCare comes from the federal government. Kieltyka Decl. ¶ 23.

awarded as of right." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (citations and quotation marks omitted). "The default rule is that a plaintiff seeking a preliminary injunction must make a clear showing that '[it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The first requirement, a likelihood of success on the merits, is the "sine qua non" of the entire inquiry, and when it is not met the remaining factors lose their urgency. *Cushing v. Packard*, 30 F.4th 27, 36 (1st Cir. 2022).

## A.    Likelihood of Success

The Constitution gives to the Congress of the United States the power of the purse. U.S. Const. art. I, § 8, cl. 1. The very first enumerated legislative powers of Congress are the powers to raise and spend money, and this means that Congress, not the Executive Branch or the Judicial Branch, has the authority to determine how to spend, or not spend, the Nation's dollars for the achievement of, among other things, the "general Welfare of the United States." *Id.* This power is further informed by the Appropriations Clause, which specifies, "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

For present purposes, the question is whether the Equal Protection Clause of the Fifth Amendment overrides the congressional will concerning the defunding of certain

abortion providers.[8]   It is well-established that spending decisions must not offend the Equal Protection Clause.  *South Dakota v. Dole*, 483 U.S. 203, 207-208 (1987).  However, where, as here, the classifications of a bill do not turn on a constitutional right but rather conduct or federal funding the Congress wishes to discourage, the Court's review is exceedingly deferential.[9]   Typically in constitutional disputes like these, a great deal of energy is devoted by the parties as to which standard of review applies.  Not so here, as the parties agree that I should apply the rational-basis test, the least rigorous tier of constitutional scrutiny.  I agree.

Assuming that the Judicial Branch can order executive agencies or their officials to transfer money from the Treasury to entities prohibited *by Congress* to receive them, in no event could the Judicial Branch do so if there is "any reasonably conceivable state of facts that could provide a rational basis for the classification."  *FCC v. Beach Comms., Inc.*, 508

---

[8] There are other recognized limitations on Congress's spending power other than the Equal Protection Clause.  Spending decisions must serve the "general welfare" and conditions imposed on states that accept federal dollars must be clear enough for the states to understand them.  *South Dakota v. Dole*, 483 U.S. 203, 207-208 (1987).  But the subsidization through Medicaid of the providers of non-qualifying abortions, however those providers may account for their receipt and expenditure of federal dollars, is, depending on who you ask, either a benefit or a bane to the general welfare.  Consequently, a general welfare challenge would have no greater chance of success than Plaintiff's equal protection claim.  And as for the relative clarity of the BBB's prohibited entities provision, Plaintiff itself alleges that the provision is clear enough for it to know that it no longer qualifies for Medicaid reimbursement.

[9] There is no authority supporting the notion that either tax-exempt essential community providers who meet the BBB's definition of "prohibited entity" or the patients who depend on their services constitute suspect classifications for purposes of equal protection analysis.  There is also some question whether Plaintiff is in fact similarly situated to the other, non-prohibited providers of non-qualifying abortion care, given that Congress employed four factors in Section 71113 to distinguish Plaintiff from other such providers.  *See* Opp'n at 7.  Potentially, this imposes yet another hurdle for Plaintiff, but I have chosen instead to focus on the plausible rationality of the disqualifying factors in relation to the task of identifying the major providers of non-qualifying abortions.  While, as a general proposition, an equal protection plaintiff has the burden to demonstrate that it was singled out unfairly for disadvantageous treatment as compared against a similarly situated comparator, that is not always a requirement of an equal protection claim. *Wadsworth v. Nguyen*, 129 F.4th 38, 54, 73 n.20 (1st Cir. 2025).  In any event, here the similarly situated inquiry and the rational basis inquiry basically dovetail.

U.S. 307, 313 (1993).  In other words, a non-suspect classification such as this "cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 367 (2001) (quoting *Heller v. Doe,* 509 U.S. 312, 320 (1993)).  "Moreover, the [government] need not articulate its reasoning at the moment a particular decision is made." *Id.*  Instead, Plaintiff must "negative 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Id.* (quoting *Beach Comms.*, 508 U.S. at 313).

To add some starch to this standard of review, the Supreme Court has long observed that the Equal Protection Clause "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Beach Comms.*, 508 U.S. at 313.  Rather:

> This standard of review is a paradigm of judicial restraint.  "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *Vance v. Bradley,* 440 U.S. 93, 97 (1979) (footnote omitted).

*Id.*  Undoubtedly, most of the public that is outraged by Congress's defunding of "prohibited entities" will feel as they do because they find the provision unwise, unfair, and illogical.  In fact, much of Plaintiff's argument turns on a public policy critique of the prohibited entities portion of the BBB.  However unwise is the prohibition of Medicaid funding to providers best positioned to deliver Medicaid services to underserved rural populations, the Judicial Branch, despite much generated confusion on this basic point, does not serve as an omnibus super-legislature to sit in final judgment as to which policy outcomes it prefers.  That judgment rests with the people.

Beyond critiquing the wisdom of the BBB, Plaintiff contends that it has been targeted by Congress for disfavored treatment merely as part of a congressional effort to deny Medicaid funding to Planned Parenthood, a separate entity that is disfavored by many members of Congress. In fact, the Supreme Court has held that a "bare congressional desire to harm a politically unpopular group" does not amount to a rational basis that would justify discriminatory lawmaking. *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). But the written Supreme Court opinions in this line all appear to involve profound irrationalities that target individuals for disfavored treatment rather than the selective treatment of entities enlisted through federal funding to carry out congressional objectives.[10] Still, there is one case in this line in which the Supreme Court upheld, without providing a written opinion, the partial invalidation of a state-funded welfare program that targeted non-profit abortion providers for exclusion but excepted from such treatment hospitals and health maintenance organizations. *Planned Parenthood of Minn. v. Minnesota*, 612 F.2d 359 (8th Cir. 1980), *sum. aff'd*, 448 U.S. 901 (1980). But the Supreme Court's summary affirmance in *Minnesota* occurred within the context of a precedential landscape in which abortion was considered a constitutional right and in which, consequently, the right of abortion providers and their patients to be protected against legislative disadvantage was at its apex under *Roe v. Wade*, 410 U.S. 113 (1973), *overruled by Dobbs v. Jackson Women's Health Org.*, 597

---

[10] *See Lawrence v. Texas*, 539 U.S. 558, 578 (2003) (finding irrational the purposeful "intrusion into the personal and private life of the individual" in relation to consensual, adult intimacies); *Romer v. Evans*, 517 U.S. 620, 627, 632-33 (1996) (involving a "sweeping and comprehensive" "change in legal status" for a class of individuals); *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985) (setting aside legislation informed only by an "irrational prejudice" against individuals with intellectual disabilities); *Moreno*, 413 U.S. at 534 (finding it irrational to deny food stamps to all low-income occupants of a household if some occupants are not related by blood).

U.S. 215 (2022).   Furthermore, the apparent rationale of *Minnesota* has since been

supplanted by Supreme Court holdings that the Government may impose requirements on

the receipt of federal funding, including mandatory organizational disassociation, out of

concern that federal subsidies extend the reach of other, disfavored organizational

objectives by, for example, keeping the lights on and paying for operational overhead.

*Rust v. Sullivan*, 500 U.S. 173 (1991) (affirming the Executive Branch's power to construe

a congressional prohibition on the expenditure of Title X monies on abortion by

conditioning such providers' participation in the Title X program on the operation of family

planning projects that do not share space, personnel, or accounting with abortion

providers).   I am not persuaded, for these reasons, that the Supreme Court's summary

affirmation of the Eighth Circuit's rational-basis takedown of the state program at issue in

*Minnesota* can bear the weight of Plaintiff's post-*Rust*, post-*Dobbs* challenge to the wisdom

of the BBB.

Furthermore, in terms of likelihood of success on the merits, Plaintiff's importuning

of congressional irrationality and its allegation of presumed, monolithic malice toward

Planned Parenthood overlooks the more plausible likelihood that the members of Congress

who voted for the BBB's prohibited entities provision most likely hold a variety of serious

and sincerely held perspectives on the issue, including a rational desire to withhold a

Medicaid subsidy from the primary providers of non-qualifying abortions.   On this point,

in opposition to Plaintiff's narrative, Defendants have offered a competing narrative that

the challenged provision is an incremental step taken by Congress to gradually remove

non-qualifying abortion providers from the Medicaid program, describing Plaintiff,

Planned Parenthood, and other affected providers as "Big Abortion."   Defs.' Opp'n (ECF

No. 24) at 5.  From Defendants' perspective, the funding prohibition is rationally targeted because it will withhold federal subsidies from providers of non-qualifying abortions and thereby achieve a net reduction in non-qualifying abortions.  *Id.* at 6-7; *see also id.* at 11 ("If that encourages entities that want to continue receiving [federal] Medicaid funds to stop providing [non-qualifying] abortions, even better—Congress may encourage behaviors it favors through the Spending Clause.").  They observe that the prohibition focuses on recipients of more substantial amounts of federal funding who are also "likely to perform a higher proportion of abortions."  *Id.* at 8; *see also id.* at 9 ("Larger providers carry out more abortions and receive more government subsidies, so they are a natural first target.").  According to Defendants, these entities, by virtue of their more focused services and broad networks, also "are more likely to engage with pregnant women seeking family-planning advice who are susceptible to efforts to push them towards abortion."  *Id.* at 9.  And as for the focus on non-profit entities, Defendants assert that "Congress could have rationally concluded that if an abortion group was already receiving such an implicit government subsidy (in the form of tax-exempt status), it should not also receive federal funds."  *Id.*  A cold calculus, I acknowledge, but Congress is entitled to withhold federal funds and otherwise disassociate from conduct that is not enshrined as a constitutional right, including through incremental measures, and notwithstanding resulting harm to some beneficiaries of its broader Medicaid programming.[11]

---

[11] Plaintiffs would offer the rejoinder that reducing access to family planning services for their patients will more likely result in unplanned pregnancies, some portion of which could end in non-qualifying abortions, as though that observation exposed the irrationality of Congress's choice.  Pl. Supp. Br. (ECF No. 29) at 6-7.  But that reasoning is only convincing if access to family planning services via federal subsidy has succeeded access to abortion as a fundamental right.  Plaintiff has not offered any precedent to that effect.  Furthermore, the rank ordering of policy choices related to the family planning program is a matter for Congress rather than the courts.

Were I to enjoin Defendants against obeying Congress's funding instructions I cannot say that I would be acting on any basis other than a difference of opinion as to "the wisdom, fairness, or logic of legislative choices," which I have no authority to do. *Beach Comms.*, 508 U.S. at 313. Recall, too, that while the allegation of malice is plausible, in the context of rational-basis equal protection claims, plausibilities favor Defendants rather than Plaintiff. *Beach Comms.*, 508 U.S. at 313-14 ("Where there are 'plausible reasons' for Congress' action, 'our inquiry is at an end.'" (quoting *United States Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980)). Only if Plaintiff can establish as a factual matter that malice was the essential cause for § 71113 of the BBB (assuming it is otherwise constitutional) will it be able to succeed in this case.[12]

Ultimately, Plaintiff has failed with its opening salvo to convincingly negate any reasonable state of facts that would rationalize the prohibition against its receipt of federal Medicaid funds. It should come as no surprise to anyone even moderately attuned to national politics that Congress has long debated the propriety of giving federal funding to health care providers who perform non-qualifying abortions. If it had the votes, no doubt

---

[12] As Chief Justice Earl Warren once wrote for a unanimous Supreme Court, quoting in part Justice Edward Douglass White: "The decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted." *U. S. v. O'Brien*, 391 U.S. 367, 383 (1968) (quoting *McCray v. United States*, 195 U.S. 27, 56 (1904)). Furthermore:

> Inquiries into congressional motives or purposes are a hazardous matter. . . . . What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork. We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it.

*Id.* at 383–84 (overturning First Circuit opinion declaring unconstitutional on First Amendment grounds a criminal sanction imposed by Congress for the destruction of a selective service registration card).

Congress could disqualify all such providers from participation in the Medicaid program. *Cf. Rust*, 500 U.S. at 192-93 ("[T]he government may 'make a value judgment favoring childbirth over abortion, and . . . implement that judgment by the allocation of public funds.'" (quoting *Maher v. Roe*, 432 U.S. 464, 474 (1977)). As it happens, a majority of the members of Congress will not vote, as yet, to go so far. But a coalition of House and Senate members have agreed in sufficient numbers, along with Vice President JD Vance,[13] to withdraw Medicaid funding from a subset[14] of abortion providers, thereby reducing the number of abortion providers who participate in Medicaid (potentially for only a one-year period) rather than eliminating them altogether. I cannot simply brush this all aside as constitutionally infirm because it only achieves a legislative end in part rather than in whole. Incrementalism is the byword for most of what Congress achieves these days and it is "virtually unreviewable, since the legislature must be allowed leeway to approach a perceived problem incrementally." *Beach Comms.*, 508 U.S. at 316.

---

[13] The BBB passed in the Senate due to the tie-breaking vote of Vice President Vance. Plaintiffs impugn the bona fides of the BBB because it was passed only with the aid of parliamentary maneuvers in the context of budget reconciliation. I do not understand why a budgetary act should be deemed irrational based on, exclusively, the failure to observe, for example, Senate filibuster and cloture process, and I therefore bypass further discussion of that theory because it does not strike me as one that is likely to succeed. *See*, *generally*, Mot. Mem. of Law at 4-5, 11-12; Defs.' Opp'n at 10. I also do not discuss outside of this footnote Plaintiff's contention that the irrationality of the BBB is demonstrated by the fact that the State of Maine is entitled as a separate sovereign to avoid this kind of federal funding change because it is responsible for administration of the Medicaid program in Maine and wants to foster non-qualifying abortion services through its network of Medicaid providers. Mot. Mem. at 12; Opp'n at 11. The challenged provision of the BBB does not prevent Maine from fostering a non-qualifying abortion network with its own funds.

[14] The subset includes Planned Parenthood, the most well-known provider of abortion services nationwide. Also impacted are abortion providers such as Maine Family Planning. The record does not provide any information concerning the number of non-qualifying abortions performed annually by all such organizations or what percentage of all non-qualifying abortions performed in the United States are provided by them. However, presumably senators and representatives are informed on the topic. Under our equal protection jurisprudence the burden is not on Defendants to supply a justification for the votes of members of Congress. The burden is on Plaintiff to negate any reasonable rationale. *Bd. of Trustees of Univ. of Alabama*, 531 U.S. at 367.

Plaintiff also contends that Section 71113 of the BBB is irrational because it does not serve its purported end, describing that end as preventing Medicaid dollars from being used to fund non-qualifying abortions. It points to the Hyde Amendment, a rider placed on the Department of Health and Human Services' annual appropriations, that already prohibits the expenditure of federal funds on non-qualifying abortions. *See*, *e.g.*, Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47 §§ 506, 507 (Mar. 23, 2024). Plaintiff protests that despite its receipt of Medicaid funding for many years, it has never been found to have violated the Hyde Amendment, an assertion that posits the need for some prior misstep to justify disqualification from the Medicaid program. But a prohibition on the manner in which federal dollars are expended once received is not the same as a prohibition on the receipt of federal funds in the first instance. Because it is not constitutionally irrational for Congress to reduce the number of non-qualifying abortion-provider participants in the Medicaid program—since it could with the requisite votes eliminate such providers from the program altogether—the Hyde Amendment is not the high-water mark of funding measures that Congress can employ to disassociate federal Medicaid expenditures from abortion services.

For the foregoing reasons, the denial of Plaintiff's request for a preliminary injunction is proper. The first requirement for entry of a preliminary injunction is a likelihood of success on the merits, which serves as the "sine qua non" of the entire inquiry, and when it is not met, the remaining factors lose urgency. *Cushing v. Packard*, 30 F.4th 27, 36 (1st Cir. 2022).

**B.    Irreparable Injury**

The irreparable injury standard seeks to determine whether, in the absence of

15

preliminary injunctive relief, the movant would suffer the kind of harm that cannot be remedied after the fact, such as through an award of damages or later-issued permanent injunction. *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). The standard asks not whether such an injury is possible, but whether it is likely. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Plaintiff expresses concern that it may have to close some clinics and that the disruption of patient care will harm its patients. However, upon presentation of its Motion for Preliminary Injunction, Plaintiff feared that it would also lose federal family planning funding under the Public Health Service Act, Title X. It has since learned that that is not the case. Suppl. Kieltyka Decl. ¶ 4 (ECF No. 25-1). Still, Plaintiff anticipates harm that will chiefly impact services to patients seeking primary care under Medicaid and those seeking family planning services under Medicaid who are not eligible for Title X benefits. *Id.* ¶¶ 6-7. Also, without access to Medicaid reimbursement for its qualifying patients, Plaintiff claims that its primary care practice is not "self-sustaining." *Id.* ¶ 7. Furthermore, "[w]ithout court intervention, unless [it] can identify a new funding source, [Plaintiff] will have to look at [its] limited reserve funding to continue providing family planning care to Medicaid patients." *Id.* ¶ 8. Plaintiff does "not know for how long" it can continue to provide that care. *Id.* Plaintiff says that these consequences will not only harm its "mission of ensuring that all people have access to high-quality, culturally relevant and affordable health care services," *id.* ¶ 9, but also will harm its reputation as a trusted community provider," *id.* ¶ 10, and its "ability to provide comprehensive care." Reply Mem. at 5 (ECF No. 25).

Plaintiff's concern over the impact of the Medicaid funding prohibition is weighty

and there is a reasonable perspective that the injury to its practice is not fully redressable once realized. I also consider the asserted injury to be more than mere "unsubstantiated fears" of a "speculative injury." Opp'n at 13 (quoting *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004), and *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6-7 (1st Cir. 1991), respectively). However, I am not convinced that Plaintiff's interest in insuring that it can fulfill its mission of providing comprehensive care across its network to all patients desiring its services is unassailable in the context of a federal legislative initiative to withdraw one tranche of federal funding. It also appears likely that Plaintiff could avoid repeat exposure to congressional legislation of the kind at issue by means of corporate and other structural and operational changes, and might well do so in light of the fact that the political pendulum has repeatedly brought Plaintiff and others to federal court to combat similar legislation, the type of which has become even more clearly foreseeable in the wake of *Dobbs*.

Despite this observation, if Plaintiff's prospect of success on the merits of its equal protection claim was strong, I would not withhold preliminary injunctive relief based on reservations about the existence of irreparable injury, since a strong showing of a constitutional injury would tend to expand the degree or nature of the injury Plaintiff would sustain. But as it is, because I find the likelihood of success showing to be weak rather than strong, and because I do not consider the showing of irreparable injury to be powerful enough to warrant a sliding scale (i.e., lower standard) in regard to the merits inquiry, Plaintiff's irreparable injury showing does not turn the outcome in its favor.

## C.    Balance of Equities and Public Interest

When legislation or other government initiatives are challenged, the balance of

equities and the public interest factors fold into one. *See Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009) ("These factors merge when the Government is the opposing party.")).  Plaintiff emphasizes that its continued provision of care, particularly to low-income patients, is the paramount interest and that the passage of time and resulting reliance on its participation in the Medicaid program outweigh the more recent shift in the Capitol that informs the defunding provision.  Mot. Mem. at 18-19.  Defendants disagree with this weighing and argue that they are in the better position due to a presumption of constitutionality as well as the interest of the public in ensuring that their representatives in Congress are able to effectuate legislation.  Opp'n at 18-19.  Defendants have the better argument.  They observe:

> That is particularly true here, where Congress has made a judgment about which entities it wishes to benefit from public funds, in a policy context of substantial human, moral, and political significance.  An order displacing Congress's assessment that it does not wish to fund certain entities unless they cease providing abortions would work grave irreparable injury on the democratically elected branches. And it would countermand the traditional rule that a congressional enactment "is in itself a declaration of public interest and policy which should be persuasive in inducing courts to give relief." *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937).

*Id.* at 19.

Plaintiff's predicament is complicated by a long-standing cultural battle over the availability of abortion spanning the nearly 50 years it was considered a constitutional right.  However, three years ago the Supreme Court held that abortion is not a right protected by any constitutional provision and as such, "the permissibility of abortion, and the limitations upon it, are to be resolved like most important questions in our democracy: by citizens trying to persuade one another and then voting." *Dobbs*, 597 U.S. at 232 (quoting *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 979 (1992)

18

(Scalia, J., concurring in judgment in part and dissenting in part)).  That is precisely the type of democratic exercise that produced the BBB.  It would be a special kind of judicial hubris to declare that the public interest has been undermined by the public.  Over the years, political winds have shifted and Plaintiff can only be understood as voluntarily standing its ground, from a corporate governance standpoint, despite the dramatically increased likelihood of defunding after *Dobbs*.   Fair enough, but while its adherents may celebrate the firmness of its convictions, those convictions are not equal to the task of enjoining congressional will in this arena.

### CONCLUSION

Because Plaintiff has failed to make a strong showing that its equal protection challenge to Section 71113 of the One Big Beautiful Bill Act has merit, and because Plaintiff's showing on the remaining preliminary injunction factors does not demonstrate that all of the preliminary injunction factors are met, Plaintiff's Emergency Motion for Temporary Restraining Order and/or Preliminary Injunction (ECF No. 5) is DENIED.

SO ORDERED.

Dated this 25th day of August, 2025.

/s/ Lance E. Walker
CHIEF U.S. DISTRICT JUDGE